TAUNTON GREYHOUND ASSOCIATION, INC. *vs.* STATE RACING
COMMISSION & others[1]
(and a companion case[2]).

Suffolk. February 14, 1980. — July 18, 1980.

Present: GOODMAN, GREANEY, & PERRETTA, JJ.

*State Racing Commission. Racing. License. State Administrative Procedure Act. Regulatory Agency. Administrative Law,* Hearing, Adjudicatory proceeding, Evidence. *Constitutional Law,* Interstate commerce.*

In determining the number of racing days to be allocated to various racing operators under the criteria specified in St. 1978, c. 494, § 13(*h*), the State Racing Commission was entitled to rely upon the exhaustive and detailed statistical and empirical data contained in a Report of the Governor's Select Committee on Racing; the fact that three members of the Commission were among the fifteen individuals that prepared the report did not preclude its use. [301-302]
The failure of the State Racing Commission to allocate an equal number of racing days in 1979 to two greyhound operators, after having made an equal distribution to both operators in past years, did not constitute an arbitrary deviation from past practice where the Commission fully set forth its reasons for the deviation. [302-303]
The State Racing Commission did not abuse its discretion under St. 1978, c. 494, § 13(*h*), in awarding certain December racing dates to a greyhound racing operator without winterized facilities rather than assigning all the less valuable winter days to an operator which had winterized facilities. [303-304]
In determining the number of racing dates to be allocated to various racing operators, the State Racing Commission did not abuse its discretion under St. 1978, c. 494, § 13(*h*), in taking into consideration the fact that one of the operators owned a controlling interest in a Rhode Island race track and was, therefore, able to tailor the racing schedule of the Rhode Island track so as not to conflict with its Massachusetts racing dates [304-306]; in the circumstances, the Commission's consid-

[1] Massasoit Greyhound Association, Inc., and New England Harness Raceway, Inc.

[2] Rehoboth Fair, Inc. *vs.* State Racing Commission.

eration of this fact was not a protectionist action in contravention of art. I, § 8, of the United States Constitution, the commerce clause [306-307].

In an action seeking review of decisions of the State Racing Commission, the fact that the Commission allocated a fewer number of racing days to the plaintiff than to another greyhound racing operator and a fewer number of evening dates than it awarded to a harness racing operator did not constitute arbitrary and discriminatory treatment of the plaintiff. [307]

A corporation holding a dog race meeting in connection with its conduct of seasonal agricultural fairs was entitled under G. L. c. 128A, § 3, to a hearing before the State Racing Commission on its application for racing dates in connection with a fair; and, therefore, the proceedings on its application were adjudicatory under c. 30A, § 1(l), and the corporation was entitled to findings and reasons under c. 30A, § 11(8), and judicial review under c. 30A, § 14. [308-311]


CIVIL ACTIONS commenced in the Superior Court Department on December 14, 1978.

The cases were heard by *Sullivan*, J.

*Hirsh Freed* (*Sheldon M. Drucker & Robert E. Brooks* with him) for Taunton Greyhound Association, Inc. & another.

*George A. McLaughlin, Jr.* (*John S. Leonard* with him) for Massasoit Greyhound Association, Inc.

*Mark J. Witkin* for New England Harness Raceway, Inc.

*Francis X. Bellotti*, Attorney General, & *Terence P. O'Malley*, Assistant Attorney General, for the State Racing Commission, submitted a brief.

PERRETTA, J. The plaintiffs in these companion cases, Taunton Greyhound Association, Inc. (Taunton), and Rehoboth Fair, Inc. (Rehoboth), sought review of decisions of the defendant State Racing Commission (Commission), pursuant to G. L. c. 30A, § 14. The Commission had allocated fewer and different racing dates in 1979 to Taunton and Rehoboth than they had requested. The judge affirmed the decision of the Commission as to Taunton, and he dismissed Rehoboth's complaint. Although the allocated 1979 racing dates cannot be affected by these appeals, the controversies presented by the parties are "capable of repetition,

yet evading review," *Karchmar* v. *Worcester*, 364 Mass. 124, 136 (1973), quoting from *Southern Pac. Terminal Co.* v. *ICC*, 219 U.S. 498, 515 (1911). *Bay State Harness Horse Racing & Breeding Assn.* v. *State Racing Commn.*, 340 Mass. 776, 777-778 (1960). *Affiliated Hosps. Center, Inc.* v. *Rate Setting Commn.*, 7 Mass. App. Ct. 563, 568-569 (1979). Therefore, we deal with the issues raised on the appeals, affirm the judgment on Taunton's complaint, and vacate the judgment on Rehoboth's complaint.

The question before the Superior Court judge and us is "whether within the record which was before the Commission and which it has sent to the court for review there is 'such evidence as a reasonable mind might accept as adequate to support' the Commission's conclusion." *Worcester* v. *Labor Relations Commn.*, 7 Mass. App. Ct. 853 (1979), quoting from *Labor Relations Comm.* v. *University Hosp., Inc.*, 359 Mass. 516, 521 (1971). Because we analyze the same records as were before the trial judge, we accord his findings no special weight. *Southern Worcester County Regional Vocational Sch. Dist.* v. *Labor Relations Commn.*, 377 Mass. 897, 903 (1979).

1. *Taunton's Appeal.*

Taunton operates the Taunton Dog Track in Dighton, and it is allowed to conduct dog racing only on those days which are assigned to it by the Commission pursuant to G. L. c. 128A, § 3, as modified by St. 1978, c. 494, §§ 10, 11, 12, 13 & 15. The dates which the Commission has available each year to distribute among the various license applicants in each county are set by § 13(c) of c. 494. Under § 13(c), greyhound racing operators in Bristol County have been allotted a total of 400 racing days a year, "inclusive of fairs."[3] Of this number, 230 days must fall within the peri-

---

[3] Within this opinion racing "dates" and "days" means a discrete set of races on a particular day, during either a matinee or evening performance. For example, if the Commission were to award an applicant a matinee and an evening performance on the same date, that would constitute an award of two racing dates to the applicant.

od January 1 through July 7, and the remaining 170 days must be assigned within the period of August 14 through December 31. Additionally, § 13(d) prohibits any two race-tracks within twenty miles of each other from conducting races at the same time, except for evenings on Saturdays and holidays.

Each year the Commission must distribute these racing dates within the prescribed periods among the various applicants in Bristol County. Its discretion in assigning these dates is controlled by § 13(h). That provision states: "[I]n granting authorized dates hereunder the state racing commission shall take into consideration, in addition to any other appropriate and pertinent factors, the following: the maximization of state revenues, the suitability of racing facilities for operation at the time of the year for which dates are assigned; the circumstance that large groups of spectators require safe and convenient facilities; the interest of members of the public in racing competition honestly managed and of good quality; the necessity of having and maintaining proper physical facilities for racing meetings and, consequently, to ensure the continuance of such facilities the necessity of fair treatment of the economic interests and investments of those who in good faith have provided and maintain such facilities."

For the 1979 racing year, Taunton and the defendants, Massasoit Greyhound Associates, Inc. (Massasoit), and New England Harness Raceway, Inc. (New England), all requested racing dates between May and July 7. Massasoit's requested dates presented no conflict with those of New England. However, Taunton sought dates which clashed with those sought by both Massasoit and New England due to the twenty-mile restriction set out in § 13(d). Further, Taunton and New England sought certain identical dates during the period August 14 through October 21. On these applications the Commission awarded Massasoit 230 dates between January 1 and July 7. Taunton received 160 dates between August 15 and December 31, forty-two of which were in December. As between Taunton and New England, the

Commission granted Taunton sixteen Monday and Tuesday evening dates and most of the matinee dates. New England received thirty-three Wednesday, Thursday, Friday and Sunday evening dates and almost four times fewer matinee dates than Taunton.

The Commission's function presents it with a situation where "the comparative appraisal of competitors is essential." *Bay State Harness Horse Racing & Breeding Assn.* v. *State Racing Commn.*, 342 Mass. 694, 703 (1961). St. 1978, c. 494, §§ 1, 13(*h*). The theme of Taunton's appeal is that when the "fair treatment" mandate of § 13(*h*) is applied to Taunton and Massasoit which are equals in all respects except that Massasoit is winterized and Taunton is not, the Commission was required to assign an equal number of dates to each. As Taunton puts it, "fair treatment between equals means equal treatment."

Taunton's first claim of error in the Commission's refusal to assign an equal number of dates is that the Commission improperly received in evidence and relied upon the Report of the Governor's Select Committee on Racing. This report provided a basis for St. 1978, c. 494. See 1978 House Doc. No. 5590. Taunton's claim fails for a variety of reasons. While Taunton states throughout its brief that the Commission "obviously" relied upon the report, it points to no particular instance to support its claim, and our review of the record has revealed none. Moreover, even if we assume that the Commission did use the report in reaching its determination, we perceive no error. The Commission is mandated by § 13(*h*) to consider numerous specified factors along with "any other appropriate and pertinent factors" including "fair treatment of the economic interests and investments" of competitors. In light of this language the Commission was justified in looking at the report. See *Hood Rubber Co.* v. *Commissioner of Corps. & Taxn.*, 268 Mass. 355 (1929); *New Bedford* v. *New Bedford, Woods Hole, Martha's Vineyard & Nantucket S.S. Authy.*, 330 Mass. 422, 429-430 (1953); *Affiliated Hosps. Center, Inc.* v. *Rate Setting Commn.*, 7 Mass. App. Ct. at 575-576. Addi-

tionally, the report contained exhaustive and detailed statistical and empirical data concerning racing in Massachusetts. When the report was offered in evidence, the Commission's attention to the data was specifically invited. Taunton's objection to the report was solely based upon its insistence that the statute was unambiguous in its terms and thus that the report was inadmissible as an interpretative aid to the Commission. Taunton cannot now raise an objection to the use of the report's data. Cf. *Kinchla* v. *Welsh*, 8 Mass. App. Ct. 367, 372 (1979). Reliance upon the report's contents by the Commission in determining what allocation of racing days would result from the application of the specified criteria in § 13(*h*) was reasonable. The Commission lacked previous experience in applying this provision to rely upon as a base. *Isgur* v. *School Comm. of Newton*, 9 Mass. App. Ct. 290, 297 n.15 (1980). The report constituted evidence upon which reasonable persons are accustomed to rely in conducting their serious affairs, and it was rightly accepted in evidence. G. L. c. 30A, § 11(2). *Goodridge* v. *Director of the Div. of Employment Security*, 375 Mass. 434, 436 n.1 (1978). Any reliance placed upon the report by the Commission was proper.

Taunton's second assertion, that because three members of the State Racing Commission were among the fifteen individuals comprising the panel that prepared the report, the entire proceedings before the Commission were tainted by the use of the report, is unpersuasive. See *Amherst-Pelham Regional Sch. Comm.* v. *Department of Educ.*, 376 Mass. 480, 491-492 (1978).

In further support of its demand for an equal number of days with Massasoit, Taunton points to the Commission's history of making an equal distribution to Taunton and Massasoit. Taunton claims that the Commission's refusal to do so in 1979 was an arbitrary deviation from its prior practice, citing *Boston Gas Co.* v. *Department of Pub. Util.*, 367 Mass. 92 (1975). Taunton's reliance on the *Boston Gas* holding is misplaced. The principle of that case is that an agency cannot deviate from an established pattern of conduct with-

out setting out the reasons for the deviation. The Commission, in its findings, specifically explained that in previous years Massasoit conducted races at comparable times of the year and that racing competition in that area was "negligible." For those reasons it was the Commission's past practice to place emphasis only on the number of days awarded. However, as a result of the introduction of winter racing dates through St. 1978, c. 494, and with increased competition from other race tracks, the Commission deemed it necessary to weigh the value of the dates available and assign them accordingly. The Commission's explanation for its departure from its prior policy fully comports with the *Boston Gas* rule, and the deviation was not whimsical, capricious or arbitrary. See *Massachusetts Elec. Co.* v. *Department of Pub. Util.*, 376 Mass. 294, 311-312 (1978).

Taunton next contends that the Commission's award to it of December racing dates when it is not winterized and Massasoit is, was made without regard to the mandate of § 13(h) that the Commission consider the suitability of the various facilities. The record conclusively demonstrates that the Commission gave due consideration to the fact that Taunton was not winterized when it awarded the extra cold-weather racing days. The Commission made specific findings that winter racing days were not as valuable as nonwinter days. It concluded that in view of all the other factors recited in § 13(h), all the less valuable winter days could not be assigned to Massasoit, the only winterized track, in lieu of the more valuable days. The Commission's determination constitutes a reasonable exercise of the discretionary authority granted to it by the Legislature. Respect must be accorded the Commission's authority and expertise in reaching its conclusion which has evidentiary support. We will not substitute our views for those of the Commission. See *Imprescia* v. *State Racing Commn.*, 6 Mass. App. Ct. 839, 840 (1978); *Fioravanti* v. *State Racing Commn.*, 6 Mass. App. Ct. 299, 302 (1978). See also *Massachusetts Elec. Co.*, 376 Mass. at 312. Taunton characterizes the Commission's findings as an "ultra vires order" that Taun-

ton winterize. However, we read the Commission's finding as a statement of the obvious: "The necessity of having and maintaining proper physical facilities for racing meetings requires Taunton to winterize *if* Taunton is to participate in the extra number of days available through winter racing" (emphasis supplied). Quite simply, Taunton need not winterize, but it cannot have the best of both worlds at Massasoit's expense.

Taunton next claims that it was arbitrarily penalized by the Commission's consideration of the fact, which Taunton alleges is irrelevant, that Taunton owns a controlling interest in the corporation that manages the winterized Lincoln Downs Greyhound race track in Rhode Island. Based upon the evidence presented to it, the Commission found that the interlocking management arrangment between Taunton and Lincoln Downs provided Taunton with the opportunity to tailor the Lincoln Downs racing schedule so that the two race tracks would not race at the same times. Evidence before the Commission showed that when the two tracks conducted racing at the same time, Taunton's revenues decreased. In the judgment of the Commission, a day without competition from Lincoln Downs was more valuable than a day with such competition, and the Commission determined such a fact to be "an appropriate and pertinent factor[ ]." We will not interfere with that determination. *Imprescia, supra,* 6 Mass. App. Ct. at 840; *Fioravanti, supra,* 6 Mass. App. Ct. at 302.

Taunton next argues that the Commission's distribution of dates among Taunton, Massasoit, and New England constitute arbitrary and discriminatory treatment of Taunton. There is no doubt that these applicants received different numbers of racing days, but that alone does not constitute improper treatment of Taunton by the Commission. "The test of discrimination in a commercial regulatory context is similar under both the United States and Massachusetts Constitutions. The [Commission's] action will be accorded all rational inferences of regularity and accuracy. The party challenging the action must affirmatively show that no

factual situation can be conceived that will support the reasonableness of the differential treatment of like entities. See *Paro* v. *Longwood Hosp.*, 373 Mass. 645, 650 (1977); *New Orleans* v. *Dukes*, 427 U.S. 297 (1976)." *Massachusetts Elec. Co., supra*, 376 Mass. at 312. The very purpose of § 13(*h*) is to guarantee fair treatment to all racing license applicants in order to further the legislative goals of c. 494.[4] Taunton's claim of a right to a number of racing days equal to that allocated to Massasoit is contrary to the goals of c. 494 and their implementation through application of § 13(*h*). Taunton's contention overlooks the fact that the Commission determined that the available racing days have different values which must be weighed in making a fair distribution among the applicants. Based upon the values assigned to the various dates the Commission did not discriminate or act arbitrarily against Taunton in allocating Massasoit a greater number of days.

The Commission's assignment of the more lucrative evening dates to New England and a greater number of matinee days to Taunton is fully supported by detailed findings

---

[4] Section 1 of c. 494 provides: "It is hereby declared, that the continued operation of the racing industry in the commonwealth is a matter of public interest; that several factors have contributed to said industry's decline and possible demise, namely: high pari-mutuel commissions for the commonwealth, small purses for horse and dog owners, rapidly increased interstate competition, uncoordinated expansion and rapidly escalating costs for the industry; that several existing laws of the commonwealth prevent the industry from restoring itself; that the commonwealth, being the recipient of over thirty million dollars annually in revenue, must assume a large share of responsibility in restoring said industry to a healthy position; and that, therefore, it is the intent of this act to redistribute the authorized racing dates within the commonwealth in a manner consistent with the best interests of racing and the public, to improve the quality of racing in the commonwealth, to insure that facilities at the racetracks are maintained in a condition consistent with public safety and convenience and humaneness to the racing animals, to instill public confidence in the integrity of the sport, to encourage bettors to patronize racetracks within the commonwealth rather than those of bordering states, to assure the retention of existing jobs and to provide new employment in said industry and ultimately to increase the revenue paid to the commonwealth from a growing industry."

and reasons made and given by the Commission. It stated that while § 13(c) greatly increases the number of available dog racing dates, under § 13(b) harness racing was granted only six additional dates. Thus, even with New England's award of the greatest number of evening dates, Taunton and Massasoit received more evening and matinee dates for 1979 than they did prior to the enactment of c. 494. Compare G. L. c. 128A, § 3, as amended through St. 1976, c. 217, §§ 1, 2, with c. 494, §§ 13(b) and (c). Further, New England may race only 180 days and only during the period of April 15 through October 21, and c. 494 reduced New England's competition-free racing period from sixteen to five weeks. Moreover, under c. 494, dog racing is afforded economic protection which is not extended to harness racing. Compare § 14 of c. 494, first and fifth paragraphs. The Commission concluded that based upon the evidence, its specialized knowledge and expertise, the allotted dates were necessary to ensure New England's financial viability and to promote the interests of the racing public and the Commonwealth.[5] The Commission did not improperly discriminate against Taunton.

Taunton's final contention is that the Commission's decision violates art. I, § 8, of the United States Constitution, the commerce clause. It claims that the Commission's consideration of Taunton's interest in Lincoln Downs constitutes economic protectionism in contravention of the commerce clause. In *Pike* v. *Bruce Church, Inc.*, 397 U.S. 137, 142 (1970), the Supreme Court held that "[w]here the statute regulates evenhandedly to effectuate a legitimate

[5] In weighing the values of the various dates the Commission did not treat Taunton arbitrarily or unequally in failing to consider the fact that one of New England's owners had an interest in several out-of-State race tracks which compete with those in Massachusetts. The evidence presented to the Commission on this issue was, at least, qualitatively different from the evidence concerning Taunton's interest in Lincoln Downs. One significant difference, among other, between the two situations was that Taunton's interest provided it with an interlocking management arrangement; the evidence as to New England's out-of-State concerns did not rise to that level.

local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits . . . . If a legitimate local purpose is found, then the question becomes one of degree." See also *Philadelphia* v. *New Jersey,* 437 U.S. 617, 624 (1978) ("The crucial inquiry, therefore, must be directed to determine whether [the Commission's decision] is basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental"). Putting the question to the present case, we conclude that the Commission's factoring of Taunton's ownership interest in Lincoln Downs has a minimal and incidental effect upon interstate commerce which is far outweighed by the local benefits it promotes. (See note 4, *supra*). The Commission's consideration of this fact was not a protectionist action. Because this interest gives Taunton a competitive edge over Massasoit, the Commission regarded it as relevant in weighing the dates to be assigned so that Taunton and Massasoit would be treated fairly under § 13(*h*). In view of these circumstances the Commission's decision does not offend the commerce clause.

In conclusion, § 13(*h*) mandates the Commission to extend fair treatment to license applicants by balancing the equities involved and considering all the factors and circumstances affecting racing performances in determining an even-handed distribution of available racing dates. We cannot substitute our views and judgment for those of the Legislature and the Commission. The Commission's decision rests upon substantial evidence, G. L. c. 30A, § 1(6), and we must give due regard to the Commission's expertise and to the discretionary authority granted to the Commission by the Legislature. *Bournewood Hosp.* v. *Massachusetts Commn. Against Discrimination,* 371 Mass. 303, 317 (1976). *Fioravanti,* 6 Mass. App. Ct. at 302. We have been presented no basis for disturbing the decision.

## 2. *Rehoboth's Appeal.*

Rehoboth is a corporation which conducts seasonal agricultural fairs in connection with which it holds a dog race meeting. See G. L. c. 128A, § 3; St. 1978, c. 494. In 1978, Rehoboth held a lease on the premises of the Taunton Dog Track, and, as in past years, it intended to conduct its county fair and dog race meeting there. Rehoboth applied to the Commission seeking a license for races on the ten consecutive evenings of the fair which the Commission had awarded it in the past. The Commission did not hold a hearing on the application, nor did Rehoboth request one. The Commission issued a decision awarding Rehoboth four evening and six matinee dates. The decision was unaccompanied by findings of fact and a statement of reasons, which Rehoboth alleges were required under G. L. c. 30A, § 11(8), and *Boston Gas, supra,* 367 Mass. at 104-105. Rehoboth filed a complaint for judicial review under c. 30A, § 14, but the judge dismissed the complaint. He had concluded that the Commission's actions on Rehoboth's application were not adjudicatory in nature and, therefore, that Rehoboth was entitled neither to findings and a statement of reasons under § 11(8) nor judicial review of the proceedings and decision under § 14.

General Laws c. 30A, § 14, gives the right of judicial review to any party aggrieved by a final decision of an administrative agency in an adjudicatory proceeding. This right of review is made meaningful by § 11(8), inserted by St. 1954, c. 681, § 1, which requires that in adjudicatory proceedings "[e]very agency decision shall be in writing or stated in the record . . . [and] shall be accompanied by a statement of reasons for the decision, including determination of each issue of fact or law necessary to the decision." Thus, pivotal to Rehoboth's claim that it was entitled to the adjudicatory protection afforded by §§ 10, 11, and 14 of c. 30A, is the determination whether the proceedings on its application were "adjudicatory" within the meaning of § 1(1). That provision inserted by St. 1954, c. 681, § 1, defines an "adjudicatory proceeding" as "a proceeding before

an agency in which the legal rights, duties or privileges of specifically named persons are required by constitutional right or by any provision of the General Laws to be determined after opportunity for an agency hearing." Because Rehoboth is a party aggrieved (it alleges that matinee races produce less revenue than evening races) by the final decision of a State agency, cf. *Bay State Harness, supra,* 342 Mass. at 700-701, we need only determine whether Rehoboth had a statutory or a constitutional right to a hearing on its application under c. 128A, § 3, as amended by St. 1978, c. 494.

Chapter 128A, § 3, requires that the Commission hold a public hearing on all applications for horse or dog racing, including races conducted "in connection with a state or county fair." The only exception to this requirement is the following proviso of § 3: Where the applicant is seeking to conduct racing in connection with a State or county fair and the applicant is one "to whom a prior license to conduct such a racing meeting at the race track specified in said application has been granted by the commission, no hearing need be held," unless one is requested by registered voters as described in § 3.[6] The parties do not dispute that Rehoboth

---

[6] The applicable paragraph of § 3, as amended through St. 1975, c. 706, §§ 202, 203, reads in full: "If any application for a license, filed as provided by section two, shall be in accordance with the provisions of this chapter, the commission, after reasonable notice and a public hearing in the city or town wherein the license is to be exercised, may issue a license to the applicant to conduct a racing meeting, in accordance with the provisions of this chapter, at the race track specified in such application; provided, that if the commission has already taken action on an application for any calendar year, after such notice and public hearing, no other public hearing need be held on any other application from the same applicant relating to the same premises filed prior to the expiration of said year; and provided, further, that on an application for a license to conduct a horse or dog racing meeting in connection with a state or county fair the applicant shall show a certificate from the commissioner of food and agriculture that (1) such fair is a state or county fair as defined in section one, (2) such fair has been operating for each of the five consecutive years immediately preceding the date of filing such application and had received for each of said five consecutive years assistance from the agricultural purposes fund, (3) such fair is properly qualified as hereinafter in

falls squarely within this exception. As no voters requested a hearing on Rehoboth's application, the Commission and New England rely upon this exception to argue that Rehoboth had no statutory right to a hearing.

We do not agree with the Commission's and New England's interpretation of the proviso in § 3. The Legislature's purpose in adopting the exception is to relieve the Commission and State and county fairs of the burden of conducting and participating in a public hearing where the fair applicant which has been previously qualified and granted licenses after public proceedings requests its annual allotment of racing dates and the required percentage of voters in the community do not request a public hearing on the present application. The proviso does not, expressly or impliedly, deprive the applicant of the right to be heard and to receive findings and reasons concerning the number and distinctions of the dates it has requested and been awarded. To prevent such action would, it seems to us, contravene the purposes of the statutory scheme and expose the allotment of the limited available dates, in a highly regulated and sensitive industry, to potentially arbitrary and capricious action. It would also pose serious doubts as to the statute's constitutionality. See *Worcester County Natl. Bank* v. *Commissioner of Banks*, 340 Mass. 695, 701 (1960); *State*

---

this paragraph provided and (4) the location where such racing meeting is to be held is annually approved by him and the board of agriculture; and provided, further, that on an application for a license to conduct a horse or dog racing meeting in connection with a state or county fair by an applicant to whom a prior license to conduct such a racing meeting at the race track specified in said application has been granted by the commission, no hearing need be held, unless a request, signed by at least one per cent of the registered voters of the city or town in which the track is located, is filed with the commission not later than thirty days following the granting of said license. In determining whether a fair is properly qualified under this paragraph, the commissioner of food and agriculture shall consider the number of days such fair has operated each previous year, the area of the land used for fair purposes, the number of entries in agricultural show events in previous years, the number and value of prizes offered in such events and whether or not the granting of a racing license would tend to promote the agricultural purposes of the fair."

*Tax Commn.* v. *Wheatland,* 343 Mass. 650, 653-654 (1962); *Board of Appeals of Hanover* v. *Housing Appeals Commn.,* 363 Mass. 339, 355 (1973). Moreover, affording a State or county fair a hearing, findings, and reasons on its application does not impinge upon the Commission's power to distribute racing dates; rather, it only provides the usual safeguards that surround a decision making process.[7]

Accordingly, we hold that Rehoboth was entitled to a hearing under § 3. Consequently, the proceedings on its application were adjudicatory under c. 30A, § 1(1), and Rehoboth was entitled to findings and reasons under § 11(8) and judicial review under § 14.

Although we have considered this issue because it is obvious that it would recur, mootness does preclude the relief Rehoboth seeks. There is no purpose in remanding this matter to the Commission for findings and a statement of reasons on its assignment of 1979 racing dates to Rehoboth. We assume that in acting upon any future application to be filed by Rehoboth, the Commission will place no reliance on its awards of 1979 and 1980 racing dates to Rehoboth.

3. *Conclusion.*

The judgment upholding the Commission's decision on Taunton's application is affirmed; the judgment on the Com-

---

[7] Rehoboth seemingly conceded that it had no statutory right to a hearing because it argued instead, in reliance upon *Board of Regents of State Colleges* v. *Roth,* 408 U.S. 564, 577 (1972), that it had a property right in the dates it requested thereby giving it a constitutional right to a hearing. The parties' agreement that Rehoboth did not have a statutory right to a hearing does not preclude us from concluding otherwise. Cf. *Utah Pub. Serv. Commn.* v. *El Paso Gas Co.,* 395 U.S. 464, 467-469 (1969) (the requirement of an adversary presentation may be disregarded if a sufficiently important public interest is at stake); *Symmes Arlington Hosp.* v. *Arlington,* 292 Mass. 162, 165 (1935) (an appellate court may relieve a party from a stipulation which is not conducive to justice). Additionally, our conclusion is not affected by the fact that Rehoboth did not request a hearing. Whether a proceeding is adjudicatory in nature does not turn upon whether a hearing is in fact conducted; rather, it turns upon whether there is a right to a hearing. If a hearing were to be waived by an applicant, the waiver would not alter the adjudicatory nature of the proceeding. At best, it might diminish the specificity that would otherwise characterize the findings and reasons the Commission would still be required to provide pursuant to § 11(8).

mission's motion to dismiss Rehoboth's complaint, Mass.R.Civ.P. 12(b), 365 Mass. 755 (1974), is vacated, and a new judgment is to be entered dismissing that complaint as moot.

*So ordered.*