Taunton Dog Track, Inc. *v.* State Racing Commission.

TAUNTON DOG TRACK, INC., & another[1] *vs.* STATE RACING
COMMISSION & others.[2]

Suffolk. December 4, 1996. - January 7, 1997.

Present: WILKINS, C.J., ABRAMS, LYNCH, O'CONNOR, & GREANEY, JJ.

*Racing. State Racing Commission. Administrative Law,* Agency's authority.
*Statute,* Construction. *Words,* "Separate racing performance."

The State Racing Commission acted within its authority under G. L.
c. 128A, § 3, to modify the terms of an approved racing license, at the
licensee's request and for good cause shown, to change specific racing
dates [58-59], and the commission was not precluded by any provision in
G. L. c. 128A or c. 128C, as in effect in 1992, from canceling racing per-
formances of a certain licensee or from amending that license to allow
the licensee to begin its "dark season" early [59-60].
The State Racing Commission's construction of the phrase "four separate
racing performances," as found in G. L. c. 128C, § 1, to allow two
seven-race performances to be held on the same day, was reasonable
[60-62]; and similarly reasonable was the commission's construction of the
term "full week" as found in that statute to cover any period of seven
consecutive days [62].
An action challenging the decisions of the State Racing Commission under
G. L. c. 128C, with respect to certain racing licensees during the 1992
season, was remanded for the resolution of a factual dispute whether
two seven-race performances held on a single day were conducted in
such a way as to be a single program rather than separate performances.
[62-63]

CIVIL ACTION commenced in the Superior Court Depart-
ment on July 27, 1992.

The case was heard by *Peter M. Lauriat,* J., on motions for
summary judgment, and entry of separate and final judgment
was ordered by *E. Susan Garsh,* J.

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.

*Thomas H. Green, III,* Assistant Attorney General, for the
State Racing Commission.

[1]Massasoit Greyhound Association, Inc.

[2]Foxboro Thoroughbred, Inc., and Foxboro Harness, Inc.

*Kevin M. Considine* for Foxboro Thoroughbred, Inc., & another.

*Joel A. Kozol* (*David M. Kozol* & *William I. Cowin* with him) for the plaintiffs.

GREANEY, J. The plaintiffs, Taunton Dog Track, Inc., and Massasoit Greyhound Association, Inc., brought an action in the Superior Court against the defendants, State Racing Commission (commission); Foxboro Thoroughbred, Inc. (Thoroughbred); and Foxboro Harness, Inc. (Harness), claiming violations of G. L. c. 128C, inserted by St. 1992, c. 101, § 35, which governs the simulcasting of horse and dog racing in the Commonwealth.[3] The plaintiffs sought declaratory and injunctive relief as well as damages from Thoroughbred and Harness for alleged violations of G. L. c. 93A (1994 ed.). The defendants filed answers and counterclaims asserting malicious prosecution and violations of G. L. c. 93A on the part of the plaintiffs. A judge in the Superior Court granted summary judgment for the plaintiffs against the defendants on some of the issues, after concluding that provisions of G. L. c. 128C had been violated. Final judgment entered on the adjudicated issues, pursuant to Mass. R. Civ. P. 54 (b), 365 Mass. 820 (1974), and the defendants appealed. We transferred the case from the Appeals Court to this court on our own motion. We conclude that the challenged actions taken by the commission were valid, although one issue requires further factual inquiry. Accordingly, we vacate the judgment and remand the case for further proceedings in the Superior Court.

The relevant background is as follows. On November 15, 1991, the commission granted Thoroughbred a license to conduct live horse racing performances between May 27 and September 7, 1992.[4] On the same day, the commission granted Harness a license to conduct live harness horse racing performances between September 18 and December 31, 1992.

Thoroughbred began its live horse racing schedule at Fox-

---

[3]The term "[s]imulcast" is defined in G. L. c. 128C, § 1, inserted by St. 1992, c. 101, § 35. In general, simulcasting involves the broadcasting or transmission of live horse or dog races conducted at another track to a recipient horse or dog track during which the recipient track accepts wagers on the simulcast races.

[4]General Laws c. 128C, § 1, defines a "[r]acing performance" as "the conduct of at least seven live races during one day."

boro Park on May 27, 1992. In addition to conducting live horse races, on July 5, 1992, Thoroughbred began, pursuant to G. L. c. 128C, to simulcast horse races from other tracks.

Thoroughbred conducted at least seven live horse races at Foxboro each day between July 5 and July 11, 1992. Thoroughbred conducted its final live racing performance on July 12, 1992. On July 15, the commission declared a state of emergency because of an equine virus that had spread to the northeast. The commission imposed a quarantine on horses at Foxboro Park, but allowed Thoroughbred to continue to simulcast races.

The plaintiffs objected to the commission's decision to permit Thoroughbred to continue to simulcast races. Thoroughbred, in response, applied to the commission to amend its license to allow its season to end as of July 23, 1992, so that Thoroughbred would "have full rights to simulcast horse races during its dark season."[5] After consideration of Thoroughbred's application (including opposing views from one of the plaintiffs), the commission approved Thoroughbred's request. Thoroughbred thereafter simulcast horse races and harness horse races from other tracks on various afternoons and evenings between July 16, and September 17, 1992. Thoroughbred did not apply for a racing license for 1993.

Harness began live harness horse racing on September 18, 1992, and also simulcast races from other tracks. On Sunday, December 6; Thursday, December 10; and Friday, December 11, Harness conducted a live racing performance of no less than seven races. On Saturday, December 12, and Sunday, December 13, Harness canceled its scheduled performances because of inclement weather. On December 14, the plaintiffs requested that the commission suspend Harness's right to simulcast because they believed that Harness had not satisfied the requirements of G. L. c. 128C, § 2, by failing to conduct a full schedule of live racing performances.[6]

December 14, 15, and 16, were regularly scheduled dark

[5]General Laws c. 128C, § 1, defines the term "[d]ark season" as "that period of consecutive days between racing seasons during which a racing meeting licensee may not conduct live racing performances."

[6]In 1992, G. L. c. 128C, § 2, provided in relevant part that:

days on which Harness conducted no racing.[7] The commission met on December 16, and gave Harness permission, over objection by one of the plaintiffs, to simulcast races on various dates. On December 17, one of the plaintiffs furnished the commission with its interpretation of G. L. c. 128C, and its understanding of the word "week" as used in that statute. Harness canceled its live racing performances on Thursday, December 17, because of inclement weather. Harness held a live racing performance on Friday, December 18, and resumed simulcasting on that date. Harness held two scheduled performances on Saturday, December 19.

The commission issued a license to Harness to conduct live harness horse racing throughout 1993, and also licensed one of the plaintiffs, Massasoit, to conduct live dog racing throughout 1993. From January 1, 1993, through February 7, 1993, Harness conducted at least four separate live racing performances of at least seven races during each week. On February 1, Harness requested that the commission allow it to cancel its Thursday evening performances and to reschedule them on Saturday evenings, as part of two seven-race programs. The commission granted the request.

On February 16, Massasoit sent a letter to the commission stating that Harness had conducted only two live performances during the week commencing on Sunday, February 7, and ending on Saturday, February 13. Massasoit requested that the commission explain why it had failed to suspend Harness's simulcasting rights because Massasoit believed the

---

"No racing meeting licensee . . . shall simulcast live races unless said licensee conducts a full schedule of live racing performances during a racing season, and if it appears that a racing meeting licensee is or will become unable to conduct a full schedule of live racing performances, the commission shall suspend such right to simulcast until said licensee conducts or resumes a full schedule of live racing performances . . . ."

General Laws c. 128C, § 1, defines a "[f]ull schedule" as "the conduct of no fewer than seven live races at not less than four separate racing performances each full week during a racing season"; a "[r]acing performance" as "the conduct of at least seven live races during one day"; and a "[r]acing season" as "that period of consecutive days including dark days during which a racing meeting licensee conducts a full schedule of live racing performances pursuant to his operating license."

[7]General Laws c. 128C, § 1, defines the term "[d]ark days" as "those days during a racing season on which live racing is not conducted."

commission was required to do so under G. L. c. 128C. The commission advised Massasoit that it had "adopted a policy which defines a week as any period of seven consecutive days."

The judge summarized the gist of the plaintiffs' claims as asserting an obligation on the part of the commission to suspend Thoroughbred's and Harness's simulcasting rights based on their inability to comply with the provisions of G. L. c. 128C. See note 6, *supra*. The plaintiffs maintained that the commission had no authority to allow Thoroughbred to end its 1992 racing season early and had acted improperly in dealing with alleged violations by Harness of G. L. c. 128C, § 2. The judge agreed and declared that Thoroughbred should not have been allowed to simulcast between July 16, and September 7, 1992, and that the commission should have suspended Thoroughbred's simulcasting rights when it became apparent that it would be unable to conduct a full schedule of live racing performances. The judge also declared that Harness had violated G. L. c. 128C when it simulcast on December 18, 1992, and on various dates after February 11, 1993; that the commission should have suspended Harness's rights to simulcast when it was "unable to conduct at least four separate racing performances of seven races each on four separate days, with each full week defined as the seven day period commencing on Sunday and ending on Saturday"; and "when it appeared that Harness . . . was counting a fourteen race program on Saturdays as two seven race programs." The commission was directed to suspend Harness's simulcasting rights when future violations occurred, and Harness was "permanently enjoined from further unlawful simulcasting when it fails to meet the criteria of G. L. c. 128C, § 2."

1. The judge decided that the commission lacked authority to permit Thoroughbred to engage in simulcasting after the commission's imposition of a quarantine to combat the equine virus. The judge referred to two provisions of G. L. c. 128C to support this conclusion. First, the judge reasoned that the language in G. L. c. 128C, § 2, which bars race tracks from simulcasting unless they conduct "a full schedule of live racing performances during a racing season" (and which requires the commission to suspend simulcasting rights if a licensee fails to meet that requirement until the licensee "conducts or resumes a full schedule of live racing performances"),

prevented the commission from amending Thoroughbred's racing license to end its racing season while permitting Thoroughbred to continue simulcasting. Second, the judge felt that the language in G. L. c. 128A, § 9B (1994 ed.), which bars the commission from adopting "emergency rules or regulations" that "shall attempt to regulate the dates . . . of horse and dog racing within the commonwealth," deprived the commission of authority to amend Thoroughbred's racing license to end its racing season early. We conclude that the commission acted within its authority when it granted Thoroughbred's request.

General Laws c. 128A (1994 ed.) confers on the commission "broad discretion in granting licenses," *Bay State Harness Horse Racing & Breeding Ass'n* v. *State Racing Comm'n*, 342 Mass. 694, 699 (1961), and requires and permits the commission to deal with a wide variety of matters in the highly competitive racing industry. Section 3 of G. L. c. 128A provides that, once the commission has taken action on a license for a given year (after the requisite notice and hearing), "no other public hearing need be held on *any other application from the same applicant* relating to the *same premises* filed prior to the expiration of said year" (emphasis added). We think this provision empowers the commission, for good cause shown, to deal with requests to amend or modify the terms of an approved racing license after the licensee's racing season begins, including an application by a licensee to change specific racing dates. The authority to amend or modify is a corollary of the power to grant a license and is supported by the settled principle that "an agency is deemed to have not only those powers expressly conferred by statute, but also those reasonably necessary to carry out its mission." *Boston Neighborhood Taxi Ass'n* v. *Department of Pub. Utils.*, 410 Mass. 686, 692 (1991). Indeed, the record indicates that the commission has applied § 3 to alter racing dates of horse and dog racing licensees without a hearing, and the plaintiffs themselves have requested amendments of racing dates under this authority.

The commission's decision with respect to Thoroughbred's license was a proper exercise of the authority. The commission's decision was divided into two separate actions, each permitted under a separate provision of the governing statute. Under G. L. c. 128A, § 9B, the commission was empowered

to terminate Thoroughbred's live racing performances because of the equine virus. This act of terminating live racing, however, did not "regulate the dates . . . of horse . . . racing," as proscribed by § 9B. It merely cancelled the performances scheduled for July 16 through 19, 1992. Thus the portion of the commission's action that terminated Thoroughbred's live racing performances was not precluded by the provision in § 9B that limits the commission's power to adopt emergency rules or regulations. The commission then proceeded to amend Thoroughbred's license to allow it to begin its "dark season" early. The commission's authority for this portion of its action was drawn not from § 9B, but was instead implied from the commission's power to grant licenses. See *Boston Neighborhood Taxi Ass'n, supra.* Further, this decision did not violate the language in G. L. c. 128C, § 2, requiring suspension of simulcasting privileges when a licensee cannot maintain live racing, pending the licensee's resumption of a "full schedule" of performances. That obligation remains in force only during a "racing season," and once the season ends, the licensee may simulcast during the "dark season" between racing meetings. That is the legal consequence of the commission's action with regard to Thoroughbred. The commission's action was not precluded by any statutory provisions.[8]

2. The judge concluded that Harness had violated G. L.

---

[8]After this case was decided in the Superior Court, the Legislature amended G. L. c. 128C, § 2, several times. By St. 1994, c. 60, § 131, the commission was empowered to permit simulcasting when "a licensee cannot conduct a full schedule of live racing performances due to weather conditions, race track conditions, strikes, work stoppages, sickness or quarantine not within the control of the licensee." The insertion of this language into what is now the seventh paragraph of § 2 is to be read in conjunction with the remaining language of that paragraph: beginning in 1996 and extending through the 1999 racing season (see St. 1995, c. 268, § 6), "no racing meeting licensee shall simulcast live races . . . unless [it], in each of those racing seasons, is licensed to conduct no fewer than a total of one hundred and fifty racing performances." (The second paragraph of § 2 has now been deleted. St. 1995, c. 268, § 3.) For Harness, which is governed by another provision in this same paragraph referring to "licensees in Norfolk county," that licensing minimum is set at one hundred racing performances. We disagree with the plaintiffs' suggestion that the 1994 amendment represents legislative recognition that, without express authorization, the commission lacked authority to amend Thoroughbred's license. We also conclude that the amendment does not make this case moot because of the pending claims for damages under G. L. c. 93A.

c. 128C by simulcasting on December 18, 1992, and on various dates after February 11, 1993, and that the commission had not complied with its statutory obligation to suspend Harness's simulcasting rights for the violations. The judge based the conclusion that Harness was in violation of the provision in G. L. c. 128C, § 2, which prevents simulcasting unless the track conducts a "full schedule of live racing performances," on its definition, i.e., "the conduct of no fewer than seven live races at not less than four separate racing performances each full week during a racing season." The judge construed the words "separate racing performances" as requiring at least seven live races on four separate days, and the word "week" as requiring those performances in a seven-day period between Sunday and Saturday. Hence, in the judge's view, Harness could not count the two seven-race programs on Saturday (approved by the commission as a substitute for Harness's usual single Thursday night performance) as "separate racing performances," and the commission could not define the word "week" as "any seven consecutive days" in deciding whether the "full week" condition had been met.

(a) *"Separate racing performances."* We agree with the commission and Harness that G. L. c. 128C, § 1, does not expressly require that the racing performances be conducted on separate days. The adjective "separate," as applied to two or more events or objects, connotes detachment of the events or objects from each other. See Webster's Third New Int'l Dictionary 2069 (1961) (defining "separate," in pertinent part, as "set or kept apart: . . . detached" and "existing by itself: autonomous"); Black's Law Dictionary 1364 (6th ed. 1990) (defining "separate" as "[i]ndividual; distinct; particular; disconnected," and "imply[ing] division"). Nonetheless, it is quite common to have live entertainment events that involve separate performances on a single day, such as matinee and evening performances of plays, sequential showings of movies, and baseball "doubleheaders."

The Legislature did not expressly state that racing performances must be held on four separate days, providing, instead, only that the performances be "separate." Given the nature of the racing industry, where tracks frequently conduct more than one racing performance a day; the reasonable construction given by the commission, as the overseeing

authority, to the phrase "four separate racing performances," see *Solimeno* v. *State Racing Comm'n*, 400 Mass. 397, 403 (1987) (commission's construction of statutes it must administer is entitled to weight); and the policy underlying G. L. c. 128C (to allow tracks to supplement revenues by simulcasting on days when live racing performances are held, on "dark days," and during the "dark season"), we conclude that Harness did not violate G. L. c. 128C because it conducted a "full schedule of racing performances," i.e., four distinct seven-race programs, even though two or more of those programs were held on the same day. See *Taunton Greyhound Ass'n* v. *State Racing Comm'n*, 10 Mass. App. Ct. 297, 299 n.3 (1980) (considering racing "dates" and "days" as "a discrete set of races on a particular day, during either a matinee or evening performance," and stating "[f]or example, if the [c]ommission were to award an applicant a matinee and an evening performance on the same date, that would constitute an award of two racing dates to the applicant").

(b) *"Full week."* The plaintiffs point out that many dictionaries define the word "week" as a period of seven successive days, usually understood as beginning with Sunday and ending with Saturday. However, the modifying word "full" in the definition with which we are concerned has to be taken into account, and we think that the commission, in doing so, could reasonably conclude that many racing weeks are not "full" because weather and other unforeseen conditions often force the cancellation of scheduled racing performances. In performing its regulatory functions, the commission did not exceed its authority in first adopting a practical definition of term "full week" as covering any seven consecutive days, and then in applying that definition to Harness's disputed racing performances.[9]

3. The conclusions expressed above eliminate most of the substantive arguments made by the plaintiffs about the validity of the decisions made by the commission and the conduct of Thoroughbred and Harness in conducting their live racing

---

[9]The amendment to G. L. c. 128C, § 2, by St. 1994, c. 60, § 131, described in note 8, *supra*, would also appear to correct for the future the problem that occurred in this case with respect to the term "full week" because it gives the commission express authority to adjust the requirement of live racing performances where the licensee has experienced difficulties beyond its control.

performances and in simulcasting. There is, however, one issue that involves a factual dispute that must be resolved by the Superior Court before the remaining aspect of the case presently before us can be concluded. As the judge noted, the materials on summary judgment are in conflict as to whether the two racing programs that the commission allowed Harness to conduct on Saturdays constitute separate racing performances or instead are conducted in a way that makes them a single program. The judge did not resolve the disputed issue because he construed the term "separate" as requiring performances on different days, and based on our construction of "separate," the resolution of that issue now becomes pertinent in determining whether Harness violated the "separate racing performance" requirement of the statute.

4. Paragraphs (1) through (8) of the "Final Judgment on Certain Claims under Mass. R. Civ. P. 54 (b)," entered on November 22, 1994, are vacated. There are to be further proceedings in the Superior Court on the issue identified in part 3 of this opinion and on such other claims as are still unresolved, after which a new judgment is to be entered that makes declarations consistent with this opinion and the facts found.

*So ordered.*