WONDERLAND GREYHOUND PARK, INC., & others[1] vs. STATE
RACING COMMISSION.

No. 97-P-134.

Suffolk. February 12, 1998. - July 23, 1998.

Present: PERRETTA, DREBEN, & LENK, JJ.

*Pari Mutuel Wagering. Racing. State Racing Commission. Statute,* Construction.

In an action challenging a written opinion of the Attorney General to the effect that unredeemed winnings from money wagers placed on "simulcast" races were to be paid over to the State treasury in accordance with G. L. c. 128A, § 5A, a judge of the Superior Court correctly concluded that the televising of live races authorized by G. L. c. 128A, § 5, constituted simulcasting and that simulcast wagers were subject to the provisions of § 5A [229-230]; and nothing in the provisions of G. L. c. 128C, regulating certain aspects of simulcast races and construed in connection with the legislative scheme set forth in c. 128A, was to the contrary [230-233].

CIVIL ACTION commenced in the Superior Court Department on June 6, 1995.

The case was heard by *Charles F. Barrett,* J., on motions for summary judgment, and entry of final judgment was ordered by *Nonnie S. Burnes,* J.

*Kevin M. Considine* for the plaintiffs.

*Edward J. DeAngelo,* Assistant Attorney General, for the defendant.

LENK, J. This controversy began on December 29, 1994, when the State Racing Commission (commission) notified Wonderland Greyhound Park, Inc., Foxboro Harness, Inc., and Foxboro Thoroughbred, Inc. (racetracks), that, pursuant to a written opinion of the Attorney General, distribution and payment of unredeemed winnings from money wagers placed on simulcast races are to be handled in accordance with G. L. c. 128A, § 5A,

---

[1]Foxboro Harness, Inc., and Foxboro Thoroughbred, Inc.

i.e., in essence, the money is to go into the State's coffers, and not remain in those of the racetracks. In response to this notice, the racetracks filed a complaint for declaratory judgment, seeking a declaration as to the meaning of G. L. c. 128C, which, they claim, exclusively governs all aspects of simulcast racing. The commission answered and filed counterclaims seeking payment of all unredeemed winning tickets for calendar years 1992, 1993, and 1994.[2] The parties filed cross motions for summary judgment. The judge denied the racetracks' motion and allowed the commission's motion for partial summary judgment, declaring that G. L. c. 128A, § 5A, governs the disposition of unclaimed winnings from simulcast races. After the parties stipulated that the ruling entitled the commission to $586,858 in unclaimed winnings, final judgment entered thereafter against the racetracks. On appeal, the racetracks claim that G. L. c. 128A, § 5A, does not apply to unredeemed tickets on simulcast wagers made under G. L. c. 128C, and, consequently, the commission is not entitled to the unclaimed winnings from these races. We affirm.

*Background.* In 1946, a time well before simulcasting came into existence,[3] G. L. c. 128A, § 5A, was enacted to govern the recovery of unclaimed winnings at racetracks. St. 1946, c. 445, § 1.[4] Pursuant to this section, an action to recover winnings upon a wager made under c. 128A must be brought by the end of the calendar year following the year in which the wager was placed. If no action is commenced by that date, the racetrack operator must pay the unclaimed winnings over to the commission for deposit into the State treasury.

In 1983, the Legislature amended G. L. c. 128A, § 5, to allow Massachusetts racetracks for the first time to televise and

---

[2]The commission's original counterclaim sought payment of the unclaimed winnings from calendar years 1992 and 1993. The commission later amended its counterclaim to seek payment of the unclaimed winnings from calendar year 1994 as well.

[3]Live "horse and dog racing meetings," however, have been permitted in the Commonwealth since 1934, when the General Laws were amended by inserting chapter 128A. St. 1934, c. 374, § 3.

[4]Statute 1946, c. 445, § 1, inserted § 5A into c. 128A to provide, in pertinent part, that "[w]ithin ninety days after said December thirty-first, money held by a licensee for the payment of any such wager for the recovery of which no action has been commenced within the time herein limited shall be paid over to and become a part of the receipts of the commission, and shall thereafter be paid into the state treasury."

accept wagers on live races occurring at racetracks in other States. St. 1983, c. 105, § 1.[5] The 1983 statute limited wagering on televised races, however, to twenty pari-mutuel[6] races each calendar year. In 1985, the Legislature again amended G. L. c. 128A, § 5, to remove the annual restrictions on the number of televised races and to insert a requirement that racetracks broadcast no more than one televised event at any one time. St. 1985, c. 580, § 9. In 1991, however, the provisions of c. 128A, § 5, permitting wagering on live televised races were revoked as of January 1, 1992. St. 1991, c. 114, § 6. See note 11, *infra.*

Finally, new legislation (St. 1992, c. 101) was passed to allow racetracks to expand more generally wagering on televised racing. This 1992 amendment to G. L. c. 128A, § 5, removed the earlier restrictions on wagering on televised races. As amended, c. 128A, § 5, authorizes "simulcast" wagering, requiring only that wagers be placed in person, in cash, and within thirty-six hours before the racing event.[7] This 1992 legislation also added c. 128C, which regulates how simulcast races may be broadcast, how payments to winners should be calculated, and how the withheld portion of a winning ticket should be distributed among various parties, including the racetrack and the commission. Chapter 128C, however, is silent on the subject of the disposition of unredeemed winnings from simulcast wagers; and § 5A of c. 128A, governing the disposition of unredeemed winnings, remains in effect as originally enacted in 1946.

*Discussion.* The racetracks contend that simulcast wagers are not "made under" c. 128A and, therefore, are not subject to the

---

[5]Statute 1983, c. 105, § 1, amends the third paragraph of § 5 of G. L. c. 128A to allow racetracks to "enter into a contract with a duly licensed racing association in another state to accept wagers on races of national or general interest which are legally held or conducted in that other state and shown by means of live television."

[6]The pari-mutuel system of betting is a system of betting where those who bet on the winner share the total amount wagered minus a certain percentage retained by the manager of the betting.

[7]General Laws c. 128A, § 5, as amended by St. 1992, c. 101, § 2, provides that "[n]o wagers on any race shall be received by a licensee unless they are made within the grounds of the licensee of the track on the day such race is held or *simulcast* or within thirty-six hours preceding such race or *simulcast* by patrons who purchase their betting tickets at the window or booths provided therefore, or as otherwise authorized pursuant to the provisions of chapter one hundred and twenty-eight C. All wagers shall be made in money and no credit shall be extended to any person making such wagers." (Emphasis added.)

provisions of c. 128A, § 5A, which regulates the distribution of unclaimed winnings. To support this contention, the racetracks claim that (1) the betting on televised races authorized in c. 128A, § 5, by the 1983 and 1985 amendments did not constitute "simulcasting," and, even if it did, this authorization was repealed in 1991; (2) the absence of provisions regarding unclaimed winnings in c. 128C exempts simulcasting from § 5A of c. 128A; (3) the court cannot legislate by inserting language into a statute; and (4) the legislative history of c. 128C does not support a conclusion that c. 128A, § 5A, applies to wagers made under c. 128C and may only be considered by the court where the statutory language is unclear. We see no merit in these arguments.

1. As an initial matter, the racetracks contend that the motion judge erroneously construed c. 128A as having authorized the same simulcast wagering activities as were authorized after the enactment of c. 128C in 1992. The racetracks argue that the televised wagering initially authorized under c. 128A was not "simulcasting" because the term "simulcasting" was not used and the nature of the wagering activity differed dramatically from the wagering activity authorized in 1992.

Prior to 1992, patrons were permitted to place wagers on a televised race conducted live at another track (the host track), but these wagers were not placed into the same pool as other wagers placed on this particular live race. After 1992, however, c. 128C, § 3, altered this rule so that all wagers on simulcast races, whether made at the host track or at a guest track, are placed into the same pari-mutuel pool. See G. L. c. 128C, § 3.[8] Thus, under the new simulcasting statute, simulcast wagers are to be placed in commingled pari-mutuel pools.[9]

Nonetheless, contrary to the racetracks' assertion, the makeup of the pari-mutuel pool is not relevant to the question of whether an activity can be classified as simulcasting. The definition of simulcasting has nothing to do with the structure of the pari-

---

[8]General Laws c. 128C, § 3, inserted by St. 1992, c. 101, § 5, provides in pertinent part that "[a]ll wagers on simulcast races accepted by a racing meeting licensee within the commonwealth or by a pari-mutuel licensee in another jurisdiction when such licensee is operating as a guest track shall be included in the pari-mutuel pool of the racing meeting licensee which conducts the live race."

[9]Pari-mutuel pools are betting pools created from placing all wagers made on a single race into one pool.

mutuel pool. Simulcasting is defined by the manner in which the live race is transmitted,[10] not by the manner in which the betting pool is created. Thus, from the definition of "simulcast" in c. 128C, § 1, it is apparent that the televising of live races authorized in c. 128A, § 5, does constitute "simulcasting" and, consequently, is subject to the provisions of c. 128A, § 5A. "Where the language of a statute is plain, the courts enforce the statute according to its wording." *Weitzel* v. *Travelers Ins. Cos.*, 417 Mass. 149, 153 (1994).

The racetracks also contend, however, that even if the wagering on televised races authorized in 1983 under c. 128A, § 5, was simulcasting, the authority to conduct such wagering was expressly revoked in 1991, and, therefore, the motion judge's ruling that simulcast wagers were "made under" c. 128A, § 5, was erroneous. See St. 1991, c. 114, § 6.[11] The flaw in this argument is that St. 1992, c. 101, restored the portion of c. 128A, § 5, that the 1991 legislation had repealed and replaced the references to televised races in c. 128A, § 5, with the term "simulcasting." Thus, in its amended form, c. 128A, § 5, explicitly includes simulcasting in the authorization of wagering set forth in c. 128A.[12] The motion judge did not err in ruling that simulcast wagers are "made under" c. 128A.

2. The racetracks next contend that the absence of provisions regarding unclaimed winnings in c. 128C exempts simulcasting from the requirements of c. 128A, § 5A. In support of this contention, the racetracks argue that c. 128C provides a comprehensive statutory scheme for wagering on simulcast races, and thus the provisions of c. 128A do not apply. Standing alone, however, c. 128C fails to address many of the fundamental concerns regarding legalized gambling which are addressed in c. 128A. Consequently, we disagree with the racetracks' contention that c. 128C comprehensively regulates simulcast wagering.

Various aspects of wagering on horse and dog racing are

---

[10] " 'Simulcast,' the broadcast, transmission, receipt or exhibition, by any medium or manner, of a live race, including but not limited to, a system, network, or programmer which transmits, or receives, television or radio signals by wire, satellite, or otherwise." G. L. c. 128C, § 1, inserted by St. 1992, c. 101, § 5.

[11] "The provisions of the third paragraph of section five of chapter one hundred-twenty-eight A of the General Laws shall not apply to any licensee who is licensed pursuant to the provisions of this act." St. 1991, c. 114, § 6.

[12] See note 7, *supra*.

regulated by c. 128A and are not regulated by c. 128C, i.e., security at the tracks,[13] accounting requirements,[14] and the inspection of licensed facilities.[15] In addition to the absence of any language regulating the distribution of unclaimed winnings,[16] c. 128C is also silent on the subjects of betting by minors,[17] the manner in which wagers may be placed or accepted,[18] and the fraudulent use of forged betting tickets.[19] In fact, c. 128C contains no licensing provisions for persons desiring to hold or conduct a horse or dog racing meeting within the Commonwealth. All such provisions are found in c. 128A. It is unlikely that the Legislature's intent was to regulate these areas with respect to live races and to leave these areas unregulated vis-à-vis simulcast racing. The Legislature's concerns regarding issues such as track security, fraudulent betting, and betting by minors are no less relevant to simulcast racing than they are to live racing. "[W]here two or more statutes relate to the same subject matter, they should be construed together so as to constitute an harmonious whole consistent with the legislative purpose." *Registrar of Motor Vehicles* v. *Board of Appeal on*

---

[13]See G. L. c. 128A, § 8 (assigning police officers to racing meetings in order to maintain fair and honest pari-mutuel racing and to protect the lives and safety of the public, property, and the animals to be raced).

[14]See G. L. c. 128A, § 6 (mandating that accurate records and books shall at all times be kept and maintained by each licensee, showing the number, nature, and amount of all wagers made in connection with such meeting).

[15]See G. L. c. 128A, § 8A (requiring periodic inspections of installations and facilities operated by licensees).

[16]We note that G. L. c. 128A, § 5A, regulates not only the distribution of unclaimed winnings but also establishes a one-year limitations period on claims by patrons. Without this section, there would be no statute of limitations imposed on the collection of winnings.

[17]See G. L. c. 128A, § 10, as amended by St. 1936, c. 238: "Any licensee permitting any minor to participate in the pari-mutuel or certificate system of wagering at a racing meeting held or conducted by such licensee shall be punished by a fine of not more than one hundred dollars."

[18]See G. L. c. 128A, § 5, providing that wagers must be placed in person, in cash, and within thirty-six hours before the racing event.

[19]See G. L. c. 128A, § 10B, inserted by St. 1973, c. 457: "Whoever, with intent to defraud, falsely makes, alters or forges a pari-mutuel betting ticket issued under the provisions of section five, or whoever, with intent to defraud, utters and publishes as true a false, forged or altered pari-mutuel betting ticket issued under the provisions of said section five, knowing the same to be false, forged or altered, shall be punished by a fine of not more than one thousand dollars or by imprisonment in the state prison for not more than five years or in a jail for not more than two years."

*Motor Vehicle Liab. Policies & Bonds*, 382 Mass. 580, 585 (1981).

Moreover, many of the provisions of c. 128C are defined by reference to provisions of c. 128A. In c. 128C, § 1, both "racing meeting licensee" and "takeout" and, in §§ 4, 5, and 6 of c. 128C, "breaks" paid from simulcast wagers are defined by reference to c. 128A. In addition, § 2 of c. 128C refers back to c. 128A to address any violations of the rules of simulcasting and to determine the fees to be paid by licensees for days when simulcast wagering occurs but live racing does not.[20] Meanwhile, c. 128A, § 5 (as amended by St. 1992, c. 101), includes simulcasting in its description of where, when, and how wagers may be received by a licensee. Given the significant interaction between c. 128A and c. 128C, it is illogical to assume that simulcast wagering is governed exclusively by the provisions of c. 128C. Compare *Taunton Dog Track, Inc.* v. *State Racing Commn.*, 424 Mass. 54, 59-61 (1997) (commission's authority to permit racetrack to broadcast simulcast races after the cancellation of live racing performances was found to have derived from both c. 128A, allowing commission to amend track's license to allow it to begin its "dark season" early, and c. 128C, allowing tracks to supplement revenues by simulcasting during the "dark season").

3. The racetracks' third contention is that a court cannot legislate by inserting language into a statute. While as an abstract legal principle this contention may be true, it has no bearing here. The judge correctly determined that simulcast racing is governed by both c. 128A and c. 128C; the application of c. 128A, § 5A, to unclaimed simulcast winnings logically follows without any judicial legislation.

Simulcast racing was originally regulated by c. 128A, pursuant to the 1983 legislation. See St. 1983, c. 105, § 1 (amending c. 128A, § 5, to allow wagering on races shown by means of live television). When the provisions governing simulcast wagering were later modified, the modifications were made within the parameters of c. 128A. See St. 1985, c. 580, § 9 (amending

---

[20]"[A]ny violation of the provisions of this chapter shall be cause for the commission to invoke its power to suspend or revoke [the licensee's] operating license pursuant to section eleven of chapter one hundred and twenty-eight A. . . . Such fee shall be determined by the commission in accordance with the license fees charged pursuant to the provisions of chapter one hundred and twenty-eight A." G. L. c. 128C, § 2, inserted by St. 1992, c. 101, § 5.

G. L. c. 128A, § 5, to remove the annual restrictions on the number of televised races and to insert a requirement that racetracks broadcast no more than one televised event at any one time). Thus, where simulcast wagers were, in fact, "made under" c. 128A, the distribution of unclaimed winnings from such wagers was governed by c. 128A, § 5A.

The enactment of St. 1992, c. 101, did not change this fact. Although — by adding c. 128C to the statutory scheme governing horse and dog racing meetings — St. 1992, c. 101, greatly expanded the regulation of simulcast racing, c. 128C itself only addresses certain issues that are peculiar to simulcast racing. The rules of general applicability that govern both simulcast and live racing were left intact. The Legislature neither removed from c. 128A the references to simulcast wagering, nor inserted in c. 128C provisions governing the distribution of unclaimed winnings. Thus, there is no indication that simulcast wagers are no longer "made under" c. 128A. "We assume that statutes do not radically change the law unless the change is clearly expressed." *Cook* v. *Hanover Ins. Co.*, 32 Mass. App. Ct. 555, 560 (1992). We conclude that simulcast wagers continue to be "made under" c. 128A and therefore are subject to c. 128A, § 5A.

4. In their final contention, the racetracks argue that the legislative history of c. 128C does not support the motion judge's interpretation of the statute and should not be considered where the language of the statute is clear. We agree that the statutes here are not ambiguous, but this conclusion does not further the racetrack's position. It is clear from the language of c. 128A, § 5, that wagers on simulcast races are "made under" c. 128A. Where the Legislature retained the references to simulcast racing in c. 128A, it is reasonable to find an intent that c. 128C be interpreted, not in splendid isolation, but in connection with the scheme set forth in c. 128A. "Statutes are to be interpreted, not alone according to their simple, literal or strict verbal meaning, but in connection with . . . the system of positive law of which they are part, [and they are to] be not unduly constricted so as to exclude matters fairly within their scope." *Pacific Wool Growers* v. *Commissioner of Corps. & Taxn.*, 305 Mass. 197, 199 (1940).

*Judgment affirmed.*