MALCOLM HOTCHKISS *vs.* STATE RACING COMMISSION.

No. 97-P-0248.

Suffolk. May 27, 1998. - November 9, 1998.

Present: BROWN, GREENBERG, & LAURENCE, JJ.

*Racing. State Racing Commission. Statute,* Construction. *Administrative Law,* Agency's interpretation of statute, Substantial evidence, Judicial review.

Substantial evidence supported the State Racing Commission's decision under G. L. c. 128A, § 10A, to eject a person whose presence the commission found was detrimental to the proper and orderly conduct of racing meetings. [688-698, 690-691]

Discussion of the regulatory powers conferred by the Legislature on the State Racing Commission. [689-690]

CIVIL ACTION commenced in the Superior Court Department on August 15, 1996.

The case was heard by *Nonnie S. Burnes,* J.

*Candies Pruitt,* Assistant Attorney General, for the defendant.

*Rosemary Curran Scapicchio* for the plaintiff.

LAURENCE, J. Justice Holmes once stated a corollary to one of our most familiar legal apothegms:

"Great cases like hard cases make bad law. For great cases are called great, not by reason of their real importance in shaping the law of the future, but because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment."

*Northern Sec. Co.* v. *United States,* 193 U.S. 197, 400 (1904) (Holmes, J., dissenting). Malcolm Hotchkiss's effort to overturn the State Racing Commission's decision to eject him from Suffolk Downs racetrack and, following a Superior Court judge's ruling in Hotchkiss's favor, the commission's determination to

vindicate that ejection by its appeal to this court hardly seem the stuff of greatness, or even of overwhelming interest, in the course of legal events. They do, however, suggest a variation on Justice Holmes's observation: "Sympathetic cases make bad law"; at least they do when, as here, a judicial effort to right a perceived wrong to a worthy individual is at odds with principles governing review of administrative agency action.

*Factual and procedural background.* Hotchkiss, a Revere resident, was hired as a mutuel clerk in late 1995 by Suffolk Downs, a licensed thoroughbred pari-mutuel racetrack (see generally *Wonderland Greyhound Park, Inc.* v. *State Racing Commn.*, 45 Mass. App. Ct. 226 [1998]), located in Revere. Mutuel clerks are nonlicensed racetrack employees responsible for collecting cash from members of the public placing bets on the results of horse races held at the racetrack and for delivering tickets to bettors reflecting their wagers. Clerks such as Hotchkiss may handle tens of thousands of dollars each day, have access to the racetrack "money room," and can accept or cancel wagers that can affect the odds and payoffs on races.

On March 24, 1996, Hotchkiss reported to his supervisor that he had received a counterfeit twenty dollar bill. As a result of this incident, Hotchkiss came to the attention of Brian Mulhern, a Massachusetts State police sergeant assigned to the State Racing Commission and to Suffolk Downs. (See G. L. c. 128A, § 8.) Mulhern recognized Hotchkiss's name from a prior State police investigation. After conducting a check of Hotchkiss's probation record, Mulhern discovered that Hotchkiss had a criminal record from the late 1970's and early 1980's involving two convictions for drug possession and several charges of other offenses (including larceny, assault and battery, firearm possession, and insurance violations) that did not result in convictions.

Mulhern's check also revealed that Hotchkiss was then under indictment in both Massachusetts and Federal courts for fencing or assisting in the operations of fences, conspiring to transport stolen goods in interstate commerce, and transporting stolen goods. Those indictments related to a large-scale theft operation with multiple defendants (many from Revere) operating throughout the northeastern United States, with Hotchkiss's role

described as that of an intermediary or courier of stolen merchandise and cash.[1]

Based upon Mulhern's investigation and findings, a State police official acting as representative of the commission on May 11, 1996, ordered Hotchkiss off the Suffolk Downs premises and denied him access to any other racing establishment in the State.[2] Hotchkiss, claiming that he had informed the person who hired him at Suffolk Downs about his criminal record and the pending indictments, appealed his ejection to the full commission, which held an evidentiary hearing on May 27, 1996, as required by the ejection statute. Mulhern, other State police officers assigned to the commission, and Hotchkiss testified at that hearing. On May 30, 1996, the commission notified Hotchkiss that it had decided to uphold his ejection until his outstanding criminal matters had been resolved, after which he could petition the commission for such remedial action as then might appear appropriate.

On July 10, 1996, the commission issued its formal findings, conclusions, and orders in Hotchkiss's case. In addition to confirming Mulhern's findings regarding Hotchkiss's earlier criminal record and all of the reported information regarding the pending theft and conspiracy indictments, the commission found that an identified agent of the Federal Bureau of Investigation had advised Mulhern that Hotchkiss "has associations with organized crime members." It further found that in a prior investigation Mulhern had been told by a confidential informant

---

[1]We take judicial notice of the fact that by the time of oral argument, May 27, 1998, Hotchkiss had in fact been convicted of all of the charges in the State and Federal indictments and was incarcerated.

[2]Hotchkiss's ejection was ordered pursuant to G. L. c. 128A, § 10A (as appearing in St. 1978, c. 494, § 8), which provides, in pertinent part:

"Any commissioner or representative of the commission or any person licensed to conduct a . . . racing meeting . . . shall have the right to refuse admission to or eject from its premises any person whose presence on said premises is detrimental, in the sole judgment of the commissioner or representative of the commission or of said licensee, to the proper and orderly conduct of a racing meeting. . . . Any person so excluded by any commissioner or representative of the commission or by a licensee shall have a right of appeal to the commission. The commission shall hold a hearing within ten days after any such person requests an appeal and may after such hearing by vote allow such person admission to such meeting."

who was involved in bookmaking activities that "there was a large scale bookmaking office that took sports bets at two telephone numbers in Revere . . . both [of which, Mulhern discovered,] . . . were listed to Malcolm Hotchkiss."[3] Those findings — most significantly, Hotchkiss's "alleged contacts and associations with organized crime figures" and his charged involvement in massive thefts occurring in the virtual shadow of Suffolk Downs — were combined by the commission with (a) the fact of Hotchkiss's "integral" position handling large amounts of money and (b) its own statutory "responsibility to the public to insure that all persons who participate in racing are honest and trustworthy" to form the basis for the order affirming the propriety of the ejection action.

*The Superior Court review.* Hotchkiss challenged the commission's decision under G. L. c. 30A, § 14, and obtained a favorable forum in Suffolk Superior Court. There, the stated reasons for vacating the commission's ejection order barely concealed judicial displeasure with what appeared an injustice done Hotchkiss: "[H]e reported to his employer, as he was supposed to, that he had received a counterfeit twenty dollar bill. The reward for this honesty was the loss of his job." The judge saw the ejection decision as unsupported by substantial evidence. Hotchkiss's past criminal record was "ancient history" and "entirely unrelated to racing." Similarly irrelevant were his pending indictments, which "did not arise out of actions at the track" and had not yet resulted in any actual convictions. Further detracting from the commission's conclusion that Hotchkiss's presence was detrimental to racing were three circumstances: (a) the praiseworthy motivation of the act that brought him to police attention — he "took steps to protect the integrity of the betting process"; (b) the encomium his union

---

[3]Mulhern testified that the two numbers "were being call forwarded to a convicted bookmaker's residence in Winthrop." He conceded on cross-examination that a grand jury presented with the results of his investigation in 1988 handed down no indictments, which he attributed to the fact that "some people took the Fifth and they refused to testify." Mulhern also introduced as an exhibit at the commission hearing an undated clipping from the Lynn Daily Evening Item entitled "Dozen locals nabbed in shoplifting scam," which listed Hotchkiss as one of a "Mafia-connected shoplifting ring" based in Revere and Stoughton which "allegedly had the blessing of the Patriarca crime family" and which had been "smashed" after netting twenty million dollars in stolen property. All of the statements in the articles were attributed to the indictments or to the United States Attorney.

gave him (in a letter its lawyer wrote to the commission) as "an exemplary employee and union member"; and (c) his voluntary revelation of his criminal past and pending indictments to the person hiring him at Suffolk Downs. The judge also concluded, based on the same perceived lack of nexus between Hotchkiss's criminal conduct (both actual and alleged) and "the racing industry itself," that the commission's decision reflected unspecified "errors of law" and an arbitrary and capricious action amounting to an abuse of discretion.[4]

Our review of the record convinces us that the commission's decision to confirm the ejection of Hotchkiss was supported by substantial evidence, was within its unusually broad discretion, and reflected no error of law.[5] It merits affirmance on the basis of that evidence, in light of the peculiar features of the racing industry, the breadth of the commission's discretionary authority, the proper limits on judicial review under G. L. c. 30A,

[4]In reaching this conclusion, the judge made only passing reference to the exceptionally broad provision of G. L. c. 128A, § 10A, authorizing the ejection of "any person whose presence . . . is detrimental, *in the sole judgment of the commissioner* or representative of the commission . . . , to the proper and orderly conduct of a racing meeting" (emphasis supplied). Our research has uncovered no other Massachusetts statute that uses the term "sole judgment" in connection with an agency's power. In light of the essentially traditional grounds for our decision, as discussed below, we need not define with precision the full extent of the commission's broad discretion under that unique empowerment. Cf. *Catrone* v. *State Racing Commn.*, 17 Mass. App. Ct. 484, 489 (1984). The judge's reliance on *LaPointe* v. *License Bd. of Worcester*, 389 Mass. 454, 462 (1983), for the proposition that even the commission's "sole judgment" cannot be exercised arbitrarily or capriciously was undoubtedly correct as an abstract proposition of law; but, as will appear, the commission's decision was far from arbitrary and capricious on this record.

[5]The judge did not identify the errors of law committed by the commission or in what way its action was arbitrary and capricious, other than by reference to the evidence that was deemed inadequate. Since the determination whether an agency's decision is supported by substantial evidence on the entire record is itself a question of law open to a reviewing court under G. L. c. 30A, § 14(7), it may be that the judge founded the "errors of law" on a view of the record evidence as insubstantial. And, since a decision that is supported by substantial evidence cannot be arbitrary and capricious, see *Massachusetts Elec. Co.* v. *Department of Pub. Util.*, 376 Mass. 294, 312 (1978), the judge may have simply relied on the inverse proposition in concluding that the commission's ejection order constituted an abuse of discretion. See *Howe* v. *Health Facilities Appeals Bd.*, 20 Mass. App. Ct. 531, 537 n.6 (1985) (without some factual support, an agency decision would ordinarily be viewed as arbitrary). Cf. *Attorney Gen.* v. *Department of Pub. Util.*, 390 Mass. 208, 228 (1983) ("Where agency action is irrational, we will find an error of law").

§ 14, and the restrictive nature of the "substantial evidence" test of c. 30A, § 14(7)(*e*). Reversing the commission's determination would amount to substitution of judicial judgment for that of an expert agency which had made a rational, discretionary choice in implementing the statutory scheme it has been empowered by the Legislature to oversee — an outcome reviewing courts must especially eschew in our system of separation of powers. See *Barrington Fair Assn., Inc.* v. *State Racing Commn.*, 27 Mass. App. Ct. 1159, 1161 (1989); *Lisbon* v. *Contributory Retirement Appeal Bd.*, 41 Mass. App. Ct. 246, 257-258 (1996), and cases cited.[6]

*The unique regulatory background.* Long celebrated as the sport of kings and a respectable diversion of the leisure class, horse racing had become by the second half of the twentieth century an extensive entertainment and gambling business sufficiently tarnished by roguish participants (at least in Massachusetts) to require "a complete and integrated plan for the regulation and control of horse racing and legalized wagering thereon." *Landers* v. *Eastern Racing Assn., Inc.*, 327 Mass. 32, 45 (1951). The chief reason for such enhanced regulation of racing was a "substantial public concern about the manner in which, and by whom, it is conducted." *Bay State Harness Horse Racing & Breeding Assn., Inc.* v. *State Racing Commn.*, 342 Mass. 694, 700 (1961). Because of "all of the many perils, pitfalls, temptations and traps for the unwary . . . [and] the occasions for corruption for the participants, all of which are inherent in any gambling operation of such proportions," the Legislature gave the commission "very broad powers necessary" to regulate the industry to prevent "these dangers."

---

[6]We share the judge's goal of attempting to check perceived abuses of power by overzealous regulators that unreasonably oppress individual citizens and are conscious of the difficulty of the task courts face in balancing our dual dedication to doing justice and applying the law. In connection with that task, we recall Judge Cardozo's admonition that it is not "the individual sentiment of justice" that must be reflected in our decision-making but rather "justice according to law": "The judge . . . is . . . not wholly free . . . to innovate at pleasure. He is not a knight-errant roaming at will in pursuit of his own ideal of beauty or of goodness. He is to draw his inspiration from consecrated principles. He is not to yield to spasmodic sentiment, to vague and unregulated benevolence. He is to exercise a discretion informed by tradition, methodized by analogy, disciplined by system, and subordinated to 'the primordial necessity of order in the social life.' " Cardozo, The Nature of the Judicial Process 140-141 (1921).

*Colella* v. *State Racing Commn.*, 360 Mass. 152, 159 (1971).

Consistently with those "full power[s]," conferred upon the commission in G. L. c. 128A "in the broadest possible language" because of the peculiar susceptibility of racing "to fraud and corruption," *Fioravanti* v. *State Racing Commn.*, 6 Mass. App. Ct. 299, 303, 305 (1978), the Legislature tightened the commission's grip on the industry in 1978 by enacting, among other reforms, the ejection statute, § 10A. That provision was part of a "substantial[] strengthen[ing of] the [c]ommission's power and ability to control horse racing in the public interest," *Perez* v. *State Racing Commn.*, 23 Mass. App. Ct. 268, 271 (1986), and was motivated in significant part by the Legislature's concern for restoring "public confidence in the integrity of the sport" (St. 1978, c. 494, § 1), which had fallen into a state of exceptional decline by the 1970's. See *Catrone* v. *State Racing Commn.*, 17 Mass. App. Ct. 484, 490 (1984).

In effecting those reforms, the Legislature again utilized the "broadest possible language" (*Fioravanti* v. *State Racing Commn.*, *supra* at 303) — "the sole judgment" of the commissioner, the commission's representative, or the licensee being the determinant of the "detrimental" nature of an ejected individual's "presence" to the proper and orderly conduct of racing (G. L. c. 128, § 10A) — so that the commission could "take swift action against anyone whose presence imperils the normal operation of the track." *Solimeno* v. *State Racing Commn.*, 400 Mass. 397, 403 (1987). Among the reasons for investing the commission with such extraordinary discretion was the need to take swift action against unlicensed individuals detrimentally involved in racing operations, who were not subject to the commission's existing power to suspend or revoke licenses. Even that significant power had proved "insufficient to maintain order at horse . . . racing tracks." *Ibid.*

*A preliminary appraisal.* Having thus set out the specifics of Hotchkiss's case, a profile of the applicable regulatory scheme, and an overview of the commission's authority thereunder, we are tempted to conclude our review. No extended analysis would seem required in order to uphold the challenged decision by an agency charged with taking swift action in order to suppress fraud and corruption and to preserve the integrity of and public confidence in racing. The commission's expulsion of an individual of Hotchkiss's reputed character — an individual

who in the past had been involved in drug-related crimes[7] and who, the commission had good reason to believe,[8] had long participated with numerous criminal associates in a massive, ongoing theft operation in Revere and elsewhere — from a position akin to that of a bank teller handling large sums of money would appear supported by common sense and experience, if nothing else. The expressly limited scope of the commission's action (excluding Hotchkiss only until such time as he had resolved his pending State and Federal criminal problems) stands as an exemplar of considered, balanced judgment, in decided contrast to an arbitrary or capricious act.[9] Notwithstanding these considerations, a decent respect to the opinions of the parties and the legal community, as well as tradition, requires (at the risk of burdening the readers of these reports) that we declare the substance of our conclusions at somewhat greater length.

*The deferential standard of review.* Fundamental precepts of judicial review mandate judicial deference to any expert agency's interpretation and application of the statute within its

[7]In his testimony before the commission, Hotchkiss admitted that at the time of his possession convictions he was addicted to cocaine but asserted he had "been clean" ever since. As the sole arbiter of credibility, see *School Comm. of Brockton* v. *Massachusetts Commn. Against Discrimination*, 423 Mass. 7, 15 (1996); *Catrone* v. *State Racing Commn.*, 17 Mass. App. Ct. at 486, the commission was not obliged to credit Hotchkiss's claim to be no longer subject to temptations to acquire money however he could to satisfy a drug dependency, particularly in light of the other evidence of his thievery.

[8]The grand jury indictment "establish[ed] probable cause to believe that the defendant committed the crime charged in the indictment." *Commonwealth* v. *Beldotti*, 409 Mass. 553, 555 (1991). Cf. *Dupree* v. *School Comm. of Boston*, 15 Mass. App. Ct. 535, 537 (1983) (in some circumstances the crime charged in an indictment is "so inimical to the duties inherent in the employment" that the indictment itself can constitute misconduct justifying suspension of the employee).

[9]Rarely does a case arise which a classic ipse dixit of Chief Justice Rugg fits, but this one arguably comes close. In holding that votes cast for a candidate who had died before election day were nullities, the Chief Justice opined, "This is not a doubtful question. It requires no discussion of legal principles. No process of reasoning is necessary to convince the intelligence. It is axiomatic. It is not open to debate. It is obvious to everybody." *Madden* v. *Election Commrs. of Boston*, 251 Mass. 95, 98 (1925). Cf. *Bell* v. *Treasurer of Cambridge*, 310 Mass. 484, 488-489 (1941) (payment of salary sought by a mayor who had been convicted of accepting bribes and who had agreed as a condition of sentence not to perform any acts as mayor, but who asserted that he was nonetheless entitled to a continued mayoral salary as an inherent incident of office, was rejected by the court as "absurd and unreasonable").

charge, under both traditional principles of review, *Berrios* v. *Department of Pub. Welfare,* 411 Mass. 587, 595-596 (1992); *Fioravanti* v. *State Racing Commn.,* 6 Mass. App. Ct. at 302, 303, and the explicit provisions of G. L. c. 30A, §§ 11(5) and 14(7).[10] Such deference is especially due in this very regulatory context, where the courts have emphasized that "[i]t is not open to th[e] court to question the wisdom" of the commission's exercise of its duly delegated power, *Colella* v. *State Racing Commn.,* 360 Mass. at 159, and that a "court should be slow to decide that . . . [the commission] has acted unreasonably or arbitrarily and should search for some ground which reasonable [persons] would regard as a proper basis for the agency's action." *Fioravanti* v. *State Racing Commn.,* 6 Mass. App. Ct. at 302.

Such a search requires rejection of an interpretation of G. L. c. 128A, § 10A, that engrafts a precondition not contained in the statute or warranted by the underlying rationale of the relevant case law: i.e., that the ejected person's questionable conduct must, to be held "detrimental," take place in the racing industry itself (see *supra* at 687-688). The commission did not so construe § 10A, and "[t]he commission's construction is entitled to weight." *Solimeno* v. *State Racing Commn.,* 400 Mass. at 403. That construction, allowing ejection for discreditable conduct wherever it may occur (see note 20, *infra*), was a reasonable one. When such a construction is, as it was here, grounded in substantial evidence (see *infra* at 695-700), it cannot be supplanted by reviewing courts. See *Massachusetts Med. Soc.* v. *Commissioner of Ins.,* 402 Mass. 44, 62 (1988).

*The commission's proactive powers.* Additionally supporting the commission's action against Hotchkiss is long-standing judicial recognition of the commission's right not to have to wait passively until someone has actually committed (or been judicially determined to have committed) a crime at the racetrack before it can take swift and decisive action to protect the industry against corruption. Rather, our courts have acknowledged the commission's authority under c. 128A to

---

[10]Section 11(5), inserted by St. 1954, c. 681, § 1, provides in pertinent part: "Agencies may utilize their experience, technical competence, and specialized knowledge in the evaluation of the evidence presented to them."

Section 14(7), as appearing in St. 1973, c. 1114, § 3, provides in pertinent part: "The court shall give due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it."

forestall "reasonably foreseeable . . . danger," *Solimeno* v. *State Racing Commn.*, 400 Mass. at 405, posed by "anyone whose presence imperils the normal operation of the track," *id.* at 403, by taking anticipatory, preventive action.

Thus, the commissioner or the commission's representative may exclude even licensed persons[11] who have not yet actually done anything illegal but are merely suspected of misconduct and have, in the commission's view, come "dangerously near" to committing detrimental acts; the commissioner or the commission's representative "could reasonably feel" that such persons were "an avoidable potential source of future difficulty" and accordingly take steps to exclude them before the potential harm eventuated. *Catrone* v. *State Racing Commn.*, 17 Mass. App. Ct. at 491.[12] Indeed, an individual who is himself personally innocent of anything illegal but should, in the commission's view, be held responsible for facilitating potential wrongdoing by others, may be excluded by the commission in order to maximize protection of the integrity of racing. *Fioravanti* v. *State Racing Commn.*, 6 Mass. App. Ct. at 302, 305

[11]Unlike unlicensed individuals, such as Hotchkiss, licensees have constitutionally protected property interests which can be adversely affected only upon compliance with the requirements of due process. See *Foster from Gloucester, Inc.* v. *City Council of Gloucester*, 10 Mass. App. Ct. 284, 291 (1980).

[12]*Catrone* involved a licensed horse trainer who was "suspected" of training "ringers"; had been "charged with racing offenses" but acquitted; had been suspended temporarily from time to time in other States for unspecified reasons; and "had an unfavorable reputation in some racing circles." *Catrone*, 17 Mass. App. Ct. at 490-491. This court upheld the commission's effective exclusion of him from Suffolk Downs (by refusing his applications for stall space and to enter horses in races) as a reasonable, discretionary judgment based on Catrone's "past conduct" and reasonably feared potential future misconduct, even though the evidence before the commission was insufficient to support his license revocation. *Ibid.*

In the instant case, the judge below did cite *Catrone*, but dismissed it as distinguishable because Catrone's "defalcations occurred in the racing industry itself," while Hotchkiss's criminal problems were "entirely unrelated to racing." As noted earlier (*supra* at 691-692), that is not a sound basis for distinguishing *Catrone*. The view that Hotchkiss's criminal conduct was unrelated to racing also fails to give any weight or deference to the commission's expert conclusion that such conduct was inconsistent with the honesty and trustworthiness it had to require of all persons involved in racing under its legislative mandate to preserve the industry from fraud and corruption. See *Fioravanti* v. *State Racing Commn.*, 6 Mass. App. Ct. at 303. See also *infra* at 697-701.

(upholding license suspension of a trainer because, inter alia, hypodermic needles and syringes were found in the room assigned to him, which a rule of the commission made him responsible for, although he himself was not shown to have known of their presence; "[t]he commission could reasonably have determined that prohibiting the mere presence of instruments which could be used to administer prohibited substances was the best way to prevent illicit use of those substances").[13]

The exercise of its prophylactic authority has consistently been affirmed as in accord with legislative intent that the commission be able to act swiftly so as "to avoid any possible involvement in evils of the type" inherently associated with gambling-entwined horse racing. See *Catrone*, 17 Mass. App. Ct. at 492. It is a preemptive power that the courts have held to be essential in "a sport 'where the greatest importance should attach to dissipating any cloud of association with the undesirable, and in which the appearance as well as the fact of complete integrity is of paramount consideration' " (citation omitted). *Ibid.* The commission's exercise of such power deserves special deference, because "[t]he importance of an administrative interpretation of a statute is 'never greater than where, as here,

---

[13]See *Solimeno* v. *State Racing Commn.*, 400 Mass. at 406-407. There, the commission ejected a greyhound trainer for association with a group of greyhound owners and trainers who were boycotting a track in order to extract various concessions from the track and the commission. The commission's ejection order was reversed by a Superior Court judge who had "substantial doubt" that the trainer had knowingly participated in the boycott. On appeal the order was reinstated, because the evidence before the commission (that the trainer was aware of the boycott, had made no inquiry about the cancellation of races caused by it despite having dogs scheduled to race, and had previously signed a letter that threatened unspecified action if various grievances of the trainers were not addressed) was held substantial enough to support its decision. Cf. *Barrington Fair Assn., Inc.* v. *State Racing Commn.*, 27 Mass. App. Ct. 1159, 1160-1161 (1989). There, the commission denied an applicant corporation a horse racing license because it appeared to be a "front" for certain individuals who wished to remain unknown. That decision was upheld, on evidence that the principal officer of the corporation was "singularly" uninformed about its business operations, while the individual for whom the corporation appeared to be fronting "had some history" of operating an illegal gaming device and was "closely identified" with a fair operation that had gone into bankruptcy. *Id.* at 1161. Additionally, "there were overtones" that some investors were a mere "conduit" for funds of unidentified others, plus "doubts" on the part of the commission that the main purpose of the operation was the encouragement of agriculture, the principals being urban "men of business, not the soil." *Ibid.*

an agency must interpret a legislative policy which is only broadly set out in the governing statute.' " *Consolidated Cigar Corp.* v. *Department of Pub. Health*, 372 Mass. 844, 850 (1977), quoting from *School Comm. of Springfield* v. *Board of Educ.*, 362 Mass. 417, 442 (1972).

In short, under the authorities, the commission's determination that Hotchkiss's presence was detrimental to racing reflected no legal error or arbitrary choice. It should have been accorded "all rational presumptions . . . in favor of [its] validity" and should have been upheld unless "it 'cannot be supported upon any rational basis of fact that reasonably can be conceived to sustain it.' " *Fioravanti* v. *State Racing Commn.*, 6 Mass. App. Ct. at 305, quoting from *Colella* v. *State Racing Commn.*, 360 Mass. at 156.[14]

*The substantial evidence test.* Condemnation of the commission's otherwise lawful determination could, therefore, be affirmed only if the challenged action was unsupported by substantial evidence in the record. We are satisfied that the ejection decision was amply supported when measured by the substantial evidence standard, which imposes significant constraints on judicial review:

> "Judicial 'review under the substantial evidence standard is circumscribed.' *Cherubino* v. *Board of Registration of Chiropractors*, 403 Mass. 350, 354 (1988). It is a standard of review 'highly deferential to the agency', which requires (as G. L. c. 30A, § 14[7] mandates) ac-

---

[14]*Fioravanti* and *Colella* both involved rules promulgated by the commission. Whether to vindicate statutory policy by rulemaking or by individual adjudication, as in Hotchkiss's case, is a matter of agency discretion. *Arthurs* v. *Board of Registration in Med.*, 383 Mass. 299, 312-313 (1981). Although the "rational basis" standard for reviewing rulemaking, which also governs the application of the "arbitrary or capricious" or "abuse of discretion" standard in reviewing agency discretion, is theoretically less rigorous than the "substantial evidence" test, in practice whichever of the alternate standards is applied probably rarely makes an outcome-determinative difference (especially because of the deference owed agency factual determinations), and they share the basic requirement that the agency action reflect "reasoned decision making within the particular statutory guidelines." *Howe* v. *Health Facilities Appeals Bd.*, 20 Mass. App. Ct. 531, 537 n.6 (1985). We are persuaded, as discussed herein, that the commission's decision here is sustainable whichever judicial review standard is used to evaluate it. As in *Catrone* v. *State Racing Commn.*, 17 Mass. App. Ct. at 491, "nothing in the record . . . [indicates] that the decision was whimsical or not based on logical analysis."

cording ' "due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it." ' *Flint* v. *Commissioner of Pub. Welfare*, 412 Mass. 416, 420 (1992).

"In order to be supported by substantial evidence, an agency conclusion need not be based upon the 'clear weight' of the evidence . . . or even a preponderance of the evidence, but rather only upon 'reasonable evidence,' *Medical Malpractice Joint Underwriting Assn. of Mass.* v. *Commissioner of Ins.*, 395 Mass. 43, 54 (1985), i.e., 'such evidence as a reasonable mind might accept as adequate to support a conclusion,' after taking into consideration opposing evidence in the record. G. L. c. 30A, §§ 1(6), 14(8); *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. 456, 466 (1981). If the agency has, in the discretionary exercise of its expertise, made a 'choice between two fairly conflicting views,' and its selection reflects reasonable evidence, '[a] court may not displace [the agency's] choice . . . even though the court would justifiably have made a different choice had the matter been before it de novo.' *Southern Worcester County Regional Vocational Sch. Dist.* v. *Labor Relations Commn.*, 386 Mass. 414, 420 (1982). *Retirement Bd. of Somerville* v. *Contributory Retirement Appeal Bd.*, 38 Mass. App. Ct. 673, 677 (1995). See also *Wheat* v. *United States*, 486 U.S. 153, 164 (1988) (the essence of discretionary authority is the power to choose within a range of acceptable options, whether or not courts might reach differing or even opposite conclusions on the same record)." (Footnote omitted.)

*Lisbon* v. *Contributory Retirement Appeal Bd.*, 41 Mass. App. Ct. at 257-258. Most pertinently, "[u]nder the substantial evidence test, a reviewing court is not empowered to make a de novo determination of the facts, to make different credibility choices, or to draw different inferences from the facts found by the [agency]." *Retirement Bd. of Brookline* v. *Contributory Retirement Appeal Bd.*, 33 Mass. App. Ct. 478, 480 (1992), quoting from *Pyramid Co.* v. *Architectural Barriers Bd.*, 403 Mass. 126, 130 (1988).

The commission's evidence regarding Hotchkiss easily passed

the substantial evidence test as delineated above, particularly when viewed through the highly discretionary lenses of (a) the deference due the commission's expertise in matters relating to the racing industry, (b) the expansive "sole judgment" standard of G. L. c. 128A, § 10A, and (c) the commission's preventive power to nip detrimental situations prefiguring corruption in the bud. The quantum and quality of the evidence leading to the decision to eject Hotchkiss compare more than favorably with what was held substantial in the cases previously cited (see *supra* at 691-695).

The undisputed evidence that the commission found of most concern consisted of Hotchkiss's well-publicized indictments for large-scale thievish activities and reputed associations with organized crime figures.[15] The commission concluded that those factors made his presence in an area of racing so integral and sensitive as collecting cash and paying off wagers inconsistent with its responsibility to insure that all participants in racing are in fact honest and trustworthy and with the need to preserve the appearance of complete integrity in racing operations. Had Suffolk Downs, as a licensee racetrack, determined to eject Hotchkiss as a detrimental presence (which G. L. c. 120A, § 10A, also authorizes, see note 2, *supra*) on the basis of such evidence, we have no doubt that it would be upheld as a "reasonable discretionary business judgment." See *Catrone* v. *State Racing Commn.*, 17 Mass. App. Ct. at 488-489.[16] The commission's ejection decision was no less reasonable, and the findings on

---

[15]Although much of the commission's evidence bearing on these concerns was technically hearsay, Hotchkiss made no argument (nor did the judge conclude) that such hearsay could not be counted as substantial evidence. In any event, even if it were not within a recognized hearsay exception, e.g., as official or regular business records, the most significant hearsay evidence — the grand jury indictments, the written records of official police investigations, the oral communications from trained law enforcement officers, and statements attributed to the United States Attorney — bore the indicia of reliability and rational probative force that qualified it for consideration in the substantial evidence calculus. See *Embers of Salisbury, Inc.* v. *Alcoholic Bevs. Control Commn.*, 401 Mass. 526, 530 (1988). Substantially reliable hearsay can, of course, be used as the basis for taking far more serious action against an individual than mere ejection from a racetrack. See, e.g., *Commonwealth* v. *Durling*, 407 Mass. 108, 118 (1990) (hearsay evidence can support revocation of probation); *Commonwealth* v. *LaVelle*, 414 Mass. 146, 149 (1993) (hearsay evidence can support criminal indictment).

[16]The *Catrone* decision explicitly refused to limit a licensee's exclusionary power under § 10A to situations grounded on "reasonable business judgment": "[W]e need not draw with precision the boundaries of permissible

which it was based comported with the practical underpinning of the substantial evidence standard: "[W]hether experience permits the reasoning mind to make the finding; [i.e.,] whether the finding *could* have been made by reference to the logic of experience" (emphasis original). *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. at 466, quoting from *Boston Edison Co.* v. *Selectmen of Concord*, 355 Mass. 79, 92 (1968). Restated as the common sense precaution that foxes should be denied access to hen houses, the commission's exclusion of Hotchkiss was both evidentially and experientially justified.

*Inappropriate judicial fact finding.* The most significant vulnerability of the Superior Court's conclusion that the commission's evidence failed the substantial evidence test derived from judicial findings of fact and drawing of inferences inconsistent with those supporting the commission's decision. Such a venture is to be avoided in judicial review of agency action generally, see *Retirement Bd. of Brookline* v. *Contributory Retirement Appeal Bd.*, 33 Mass. App. Ct. at 480, and is contrary to explicit appellate admonitions regarding review of this commission's decisions in particular. See *Solimeno* v. *State Racing Commn.*, 400 Mass. at 406 ("[T]he commission, not the [Superior Court] judge or this court, is the finder of fact . . ."); *Fioravanti* v. *State Racing Commn.*, 6 Mass. App. Ct. at 303 ("In determining whether the commission's findings are based upon substantial evidence, . . . [t]he court may not displace the commission's choice between fairly conflicting views"); *Catrone* v. *State Racing Commn.*, 17 Mass. App. Ct. at 486 ("The trial judge, in reviewing the commission's decision, purported to make findings as if the proceeding before him constituted a trial de novo. Under § 14, '[it] is . . . the function of the [agency] and not a judge to make findings of fact' . . . [and] to weigh the credibility of witnesses . . .").[17]

The judge below considered the commission's ultimate finding that Hotchkiss's presence was detrimental to racing to be undermined by two sets of facts, found or inferred. The first

exclusion . . . ." *Id.* at 489. Nor need we do so here with respect to the breadth of the commission's power.

[17]Judicial factfinding on a G. L. c. 30A, § 14, review of an administrative agency decision is ineffective as well as inappropriate, because, since we review the same record that was before the Superior Court, we accord the judge's "findings" no weight. *Taunton Greyhound Assn., Inc.* v. *State Racing Commn.*, 10 Mass. App. Ct. 297, 299 (1980).

related to Hotchkiss's supposed good character; the second concerned the relevance to racing of Hotchkiss's criminal involvement. As to the first set, the judge found that, prior to being hired, Hotchkiss had disclosed his criminal record and pending indictments to his new employer, Suffolk Downs; that he had brought the counterfeit money to the attention of his supervisor "to protect the integrity of the betting process"; and that his good work performance and honesty were illustrated by his union's praise. The commission made no express findings regarding any of these matters, but its decision to eject Hotchkiss reflects its rejection of them all as either lacking credibility or irrelevant to the issue of the potential detriment to racing that Hotchkiss's presence posed.[18]

The imputation to Hotchkiss of honesty and concern for the integrity of racing because of his disclosure of the counterfeit bill was based entirely upon Hotchkiss's self-serving testimony about his good intentions. Aside from the impropriety of such credibility determinations by a reviewing court, Hotchkiss's testimony did not ineluctably yield such an inference. Having initially shown the counterfeit bill to another mutuel clerk, Hotchkiss could as well have been motivated (the commission could reasonably infer) by a self-protective concern that any failure thereafter to disclose the bill to a supervisor might lead to an accusation against him by his coworker, which could

---

[18]Hotchkiss testified to the commission that he had revealed his criminal record and indictments to the Suffolk Downs director of security, Robert Fawcett. In addition to disbelieving Hotchkiss generally, as it had a right to do (see note 7, *supra*), the commission could well have found that this assertion was inconsistent with Officer Mulhern's report and testimony regarding his discovery that Hotchkiss had turned over a counterfeit bill. Mulhern had obtained that information from the same Robert Fawcett, who nonetheless did not provide Mulhern with any details about Hotchkiss's criminal involvements; Mulhern had to research those involvements for himself. The commission also could discount the unverified letter endorsement from Hotchkiss's union (made by its lawyer rather than a shop steward or other union representative who had actually worked with Hotchkiss), which consisted of conclusory, third- and fourth-level hearsay about his allegedly meticulous work record. In light of the improbabilities in Hotchkiss's evidence and the substantiality of the evidence against him on which the commission relied, the commission had explicit and objectively adequate reasons to disbelieve Hotchkiss's evidence. See *Johnson* v. *Commissioner of Pub. Welfare*, 414 Mass. 572, 581 (1993) ("evidence of a party having the burden of proof may not be disbelieved without an explicit and objectively adequate reason").

result in his termination or the uncovering of the full extent of his embroilment in the criminal law.[19]

The de novo finding that Hotchkiss's criminal record (including the pending indictments) was unrelated to racing and therefore irrelevant to the commission's purview was particularly inapt.[20] It squarely contradicted the ultimate finding of the commission — that it was necessary, in order to preserve the ap-

---

[19]The findings and inferences as to Hotchkiss's supposed good character were thus selectively based upon such questionable or nonexistent record evidence that it hardly could be said to "detract[] from the weight of the [commission's] opinion," *Arthurs* v. *Board of Registration in Med.*, 383 Mass. 299, 304 (1981). Indeed, such evidence was essentially irrelevant in evaluating the validity of disciplinary action by a regulatory agency charged with suppressing whatever undermines public confidence in the integrity of the regulated activity. See *Sugarman* v. *Board of Registration in Med.*, 422 Mass. 338, 345 n.14 (1996).

[20]The finding in this regard also constituted legal error (as discussed *supra* at 690-695 and note 12) because it supplanted the commission's expert construction of G. L. c. 128A, § 10A. That construction, explicitly based upon its "knowledge of the racing industry," reasonably determined that indictments of an individual for crimes implicating stealing and dishonesty, plus the reliably reported association of that individual with known criminals involved in illegal gambling and loansharking operations and large scale thefts, were sufficient to establish that the individual's continued presence was detrimental to racing, even if the actual criminal conduct occurred outside of racing. The error is partially attributable to failure to take into account case law cited by the commission supporting agency discipline in the interest of protecting the image and integrity of the regulated industry even when the criminal conduct at issue was claimed to be unrelated to the industry itself and not subject to agency regulation. See *Levy* v. *Board of Registration & Discipline in Med.*, 378 Mass. 519, 526-528 (1979) (fraudulent financial operation of nursing homes by doctor); *Raymond* v. *Board of Registration in Med.*, 387 Mass. 708, 711, 713 (1982) (illegal possession of weapons); *Alsabti* v. *Board of Registration in Med.*, 404 Mass. 547, 553-554 (1989) (acts of plagiarism); *Sugarman* v. *Board of Registration in Med.*, 422 Mass. 338, 342-343 (1996) (releasing confidential information relating to a contentious child custody litigation to the media; the court responded to the appellant's complaint that she had done nothing illegal by noting, at 343, that the agency had "broad authority to 'protect the image of the medical profession' and is not limited to disciplining conduct involving direct patient care, criminal activity, or deceit"). Although these precedents all involved the agency entrusted with regulation of the practice of medicine, the same standard applies to review of its disciplinary actions as to review of the commission's orders, see G. L. c. 112, § 64, and the two agencies share as a primary purpose preserving public confidence in the integrity of the regulated activity and insuring the good character of those involved therein. See *Raymond* v. *Board of Registration in Med.*, 387 Mass. at 713; *Barrington Fair Assn., Inc.* v. *State Racing Commn.*, 27 Mass. App. Ct. at 1160-1161.

pearance of integrity in the racing industry and to maintain public confidence in the trustworthiness of all involved in it, to remove a person strongly suspected of extensive dishonesty from a position that required honest handling of large sums of money. The faulty finding of lack of relationship led directly to the incorrect inference that larcenous acts, which two grand juries had found Hotchkiss probably guilty of engaging in, were not detrimental to the orderly conduct of racing.

That questionable inference further suffered from a failure to take into consideration the information conveyed to the commission by the indictments and by State police witnesses (see *supra* at 686-687 and note 3) regarding Hotchkiss's reputed associations with organized crime figures, not only in the massive theft operations but in illegal gambling activities as well. See *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. at 466 ("substantial evidence" review involves consideration of the entire record, not merely selected portions thereof). The commission expressly determined such associations to be highly relevant, in conjunction with the serious indictments, to its conclusion that Hotchkiss's continued presence was detrimental to racing — an eminently reasonable determination on this record.

*Conclusion.* The commission's decision upholding Hotchkiss's ejection, based upon its finding that his presence at Suffolk Downs was detrimental to racing, was within its statutory authority and grounded on substantial evidence, derived in large part from its assessment of the credibility of the witnesses who appeared before it and the reasonable inferences it drew from that evidence. It was not the function of a reviewing court under G. L. c. 30A, § 14, to displace the factual determinations of the agency experienced in the unique features and requirements of the racing industry or to exercise an independent assessment of the evidence. It was, rather, the court's obligation to accept them when, as here, they were supported by substantial evidence in the record considered as a whole and reflected a reasoned choice between conflicting views of that evidence.

Accordingly, the judgment is reversed, and a new judgment is to be entered affirming the July 10, 1996, decision of the commission.

*So ordered.*