Hines, Geraldine S., J.
The plaintiff, Sheriyl Meade (“Meade”), brought this action against the defendant, the State Racing Commission (the “Commission”), challenging the Commission’s decision upholding a ten-day suspension of Meade’s horse-trainer’s license after a urine sample taken from a horse she trains tested positive for cocaine. The matter now before the court is Meade’s Motion for Judgment on the Pleadings. After a hearing and review of the parties’ submissions, Meade’s Motion for Judgment on the Pleadings is ALLOWED.
BACKGROUND
The following facts are taken from the Administrative Record. On October 9, 2006, Meade, a licensed horse trainer, entered her horse, Pleasing Amy, in the seventh race at Suffolk Downs Racetrack (“Suffolk Downs”). Pleasing Amy finished in second place. After the race, Pleasing Amy was randomly selected for a urine sample drug-test. Pursuant to testing procedures, Orlando Bocachica (“Bocachica”) brought Pleasing Amy to the spit box. Bocachica is an employee of Meade’s, and was her designated representative pursuant to 205 Code Mass. Regs. §4.32(4).[1] The spit box is eighty to one hundred feet long and thirty to forty feet wide, and consists of six stalls, a storage room, and an office. The cups used to collect urine samples are stacked unsealed and upside down. Pleasing Amy’s urine sample was obtained by Commission veterinarian, Dr. Kevin Lightbrown (“Light-brown”), in the presence of a Commission testing agent. Lightbrown then sealed the urine sample. Massachusetts State Trooper Sparuk transported all the urine samples taken on October 9th to the Commission laboratory. The samples were then stored in a locker at the Commission laboratory. On October 10th, an assistant chemist removed Pleasing Amy’s urine sample from the locker and segregated portions of the sample for testing.
On October 17 and 18, 2006, Bruce Aspeslagh (“Aspeslagh”), the Chief Chemist at the Commission’s laboratory, conducted multiple tests on Pleasing Amy’s urine sample. The results of these tests indicated the presence of cocaine in Pleasing Amy’s urine sample, but not its metabolites. On October 18, 2006, the laboratory issued a report notifying the Commission and the Suffolk Downs Board of Stewards (“Stewards”) that cocaine had been found in Pleasing Amy’s urine sample. On October 28,2006, the Stewards held a hearing, and on October 31,2006, issued its decision suspending Meade’s license for the remainder of the meet plus ten days and fining her $500.00. Meade appealed the Stewards’ decision to the Commission, and a hearing was held on December 19, 2006.
At the Commission’s hearing, Meade presented the expert testimony of Louis Shuster, Ph.D. (“Dr. Shus-ter”) and Richard Sheehan, D.V.M. (“Dr. Sheehan”). Dr. Shuster explained the process by which cocaine is metabolized, and broken down by esterases, which are *342 enzymes found in blood and various tissues including the liver. Dr. Shuster testified that “cocaine is metabolized very rapidly [into the metabolites] ecgoninemethylester and benzoylecgonine” and that if the cocaine had been metabolized by the horse, he would expect to find the presence of both the parent compound and metabolites. A.R. Vol. II, at 101. Dr. Shuster further testified that benzoylecgonine can be produced non-enzymatically if cocaine is kept in serum, because the carbon dioxide in the serum increases, producing an excess of bicarbonate which raises the pH, thereby making the serum more alkaline, and that an alkaline pH creates a non-enzymatic breakdown of cocaine. A.R. Vol. II, at 101-02. Dr. Shuster also testified that a horse’s diet could increase the alkaline level of its urine, and that alkaline urine produces a similar non-enzymatic breakdown. A.R. Vol. II, at 101-02.
Dr. Shuster testified that cocaine starts to be metabolized once it enters the blood stream, irrespective of the way it is administered. A.R. Vol. II, at 103. With respect to the time delay between when cocaine is administered and when metabolites would begin to appear, Dr. Shuster stated that metabolites would begin to appear “within five to ten minutes” from when the cocaine is administered. Dr. Shuster also stated that the amount of time it takes a horse to break down cocaine so that metabolites are present varies based on a number of factors. A.R. Vol. II, at 113-14. Dr. Shuster’s opinion, taking into account all the facts, was that the lack of metabolites in Pleasing Amy’s urine sample meant that the cocaine had not passed through her body and that the presence of cocaine in her urine sample was due to contamination. A.R. Vol. II, at 106-10. Dr. Sheehan agreed that the cocaine was not metabolized by Pleasing Amy, based on the lack of metabolites present in her urine sample. Dr. Sheehan testified that because of the lack of metabolites in the urine sample, it was his opinion that the cocaine found in Pleasing Amy’s urine sample was the result of contamination. A.R. Vol. II, at 124-25.
The Commission also heard testimony from As-peslagh, and Dr. Alexandra Lightbrown (“Dr. Light-brown”), the Commission’s veterinarian. Neither witness rebutted the generally accepted scientific principle that if cocaine enters the body, it would be evidenced by metabolites in the urine.
Aspeslagh testified that because no metabolites were found in Pleasing Amy’s urine sample, they could not be certain that the cocaine had passed through Pleasing Amy’s system. A.R. Vol II., at 51. Aspeslagh testified that based on his experience in administration trials, there was very little metabolic activity relative to the parent drug, when testing samples in which drugs had been administered to the animal within one hour. A.R. Vol. II, at 53. With two-hour samples, however, Aspeslagh testified he would expect to see metabolites in almost every instance. A.R. Vol. II, at 52-53. Aspeslagh also testified that the dosage of cocaine administered affects the length of time that the parent compound could remain present in a urine sample. A.R. Vol. II, at 57.
Dr. Lightbrown agreed that cocaine is metabolized by the liver. A.R. Vol. II, at 68. However, she also testified that in administration trials, if cocaine was administered “nasally and got into the respiratory tract or . . . under the tongue, then it is possible, it goes into the venous drainage, and that theoretically it’s possible that that [cocaine] would not go to the liver before it would go to the kidneys.” A.R. Vol II, at 69-70.
On March 12, 2007, the Commission issued its Findings and Conclusions, upholding the Stewards’ decision to suspend Meade’s license for the remainder of the meet plus ten days, but rescinding the $500.00 fine. Pursuant to G.L.c. 30A, Meade appealed the Commission’s decision to the Superior Court. On June 26,2008, this court (Cratsley, J.) remanded the matter to the Commission, ruling that the Commission’s decision was not supported by substantial evidence “because its findings are inconsistent with the available records and evidence presented to it.” The court concluded that the Commission’s expert testimony that it was “theoretically possible” that cocaine could have been administered to the horse despite a lack of evidence of metabolites did not satisfy the substantial evidence test. This conclusion was especially compelling where the plaintiffs expert testimony was based on indisputably reliable scientific evidence to the contrary. The remand order required a “new hearing in which the Commission must, at a minimum, clarify its selective use of the Lightbrown testimony.” The court was expressing its concern that the Commission rested its decision on Dr. Lightbrown’s testimony that it was theoretically possible that cocaine would not be metabolized by the liver while ignoring her agreement with the generally accepted scientific principle proffered by Meade.
On August 20, 2008, the Commission issued Supplemental Findings and Conclusions affirming its March 12, 2007 decision. The Commission chose not to explain its prior reliance on Dr. Lightbrown’s “theoretically possible” testimony. Instead, it concluded that Meade did not prove that cocaine was not administered to Pleasing Amy.
DISCUSSION
Pursuant to G.L.c. 30A, §14, Meade petitions this court to review the Commission’s decision. Meade asserts four arguments. First, Meade argues that the Commission’s decision is not supported by substantial evidence. Second, Meade alleges that the Commission’s experts were not qualified to offer expert opinions. Third, Meade contends that by placing the burden on her to establish contamination of the urine sample, the Commission acted “ultra viresfy.” Fourth, Meade asserts that the Commission’s interpretation of 205 Code Mass. Regs. §4.32(8) and §4.35(9) was arbi- *343 traiy, unreasonable, and inconsistent with their plain meaning. Based on this court’s review of the Commission’s decision after remand, I am compelled to conclude that the Commission’s decision once again is not based on substantial evidence. Therefore, I need not address plaintiffs other arguments.
When reviewing an agency decision, the court is required to give “due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it.” G.L.c. 30A, §14(7). See Hotchkiss v. State Racing Comm’n., 45 Mass.App.Ct. 684, 688-90 (1998) (describing “very broad powers” given to Commission to regulate racing industry). The agency’s decision must be supported by substantial evidence. G.L.c. 30A, §14(7). Substantial evidence, means “such evidence as a reasonable mind might accept as adequate to support a conclusion." Id., at § 1 (6). In assessing whether the underlying evidence is substantial, the court cannot displace an agency’s decision between two fairly conflicting views, even though the court may have justifiably made a different decision. Hotchkiss, 45 Mass.App.Ct. at 695-96. The court must consider the record as a whole, but as long as the agency’s findings are properly supported, the decision will not be disturbed. Tri-County Youth Programs, Inc. v. Acting Deputy Dir. of the Div. of Employment & Training, 54 Mass.App.Ct. 405, 408 (2002).
Rather than address the issue of the unscientific opinion testimony underlying its original decision as directed by the remand order, the Commission took an entirely different tack. It focused on supposed defects in the merits of the plaintiffs expert testimony. It concluded that plaintiff had the burden to prove that the cocaine did not enter the horse’s system and that her expert testimony fell short in proving this fact. The Commission did not explain why it rejected the generally accepted scientific principle related to metabolites which by itself is substantial evidence that the cocaine did not enter the horse’s body. Based on the testimony of Dr. Shuster with respect to metabolic rate variability, the Commission stated that Meade was required to “clearly establish (i) Pleasing Amy’s own metabolic rate, (ii) the pH of the horse’s blood and urine, (iii) whether her blood contained esterase inhibitors, and (iv) provide [the Commission] with a reliable formula that expresses the detectability of cocaine metabolites as a function of these variability factors.” A.R. Vol. Ill, 4-5. This new focus on supposed defects in the plaintiffs proof is tantamount to moving the goal post. It is, in my judgment, nothing more than a legal sleight of hand to justify the same result.
Even assuming that plaintiff bears the burden of proof that the cocaine did not enter the horse’s body, she met that burden because her evidence was scientifically validated and undisputed. The Commission accepted plaintiffs proffer that if cocaine enters the body, it inevitably metabolizes. A.R. Vol. Ill at 4. Plaintiffs expert’s testimony based on established scientific principles that cocaine could not have entered the body without being metabolized was sufficient, especially after the Commission abandoned its reliance on its expert’s “theoretically possible” statements in its remand decision. Plaintiffs evidence was such as might be accepted by a reasonable person as adequate and there was no rebuttal by the Commission’s expert. The Commission’s remand decision rejecting the plaintiff s evidence without any credible contraiy opinion is not based on substantial evidence and cannot stand.
ORDER
For the above mentioned reasons, it is hereby ORDERED that Sherryl Meade’s Motion for Judgment on the Pleadings be ALLOWED. It is further ORDERED that the State Racing Commission’s decision be REVERSED.

 “The owner, trainer or [her] groom or other authorized representative shall be present in the testing enclosure when a saliva, urine or other specimen is taken from [her] horse and shall remain until the sample tag is attached to the specimen container.”